**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 99-60758

AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY,

Plaintiff-Counter Defendant-Appellee,

VERSUS

THE 1906 COMPANY, ETC.; ET AL

Defendants

THE 1906 COMPANY (Formerly Known as Hattiesburg Coca-Cola
Bottling Company); RICHARD S. THOMSON;

Defendants-Cross Defendants-Counter Claimants-Appellants,

and

GENERAL STAR NATIONAL INSURANCE COMPANY,

Defendant-Cross Claimant-Counter Claimant-Appellant.

Appeal from the United States District Court
For the Southern District of Mississippi, Jackson Division

November 12, 2001

Before SMITH and DENNIS, Circuit Judges, and ROETTGER,[1] District
Judge.

---

[1] District Judge of the Southern District of Florida, sitting
by designation.

DENNIS, Circuit Judge:

American Guarantee and Liability Insurance Company ("American Guarantee") brought this diversity suit seeking a declaratory judgment that the comprehensive general liability ("CGL") insurance policies it sold to Hattiesburg Coca-Cola Bottling Company ("Hattiesburg Coke" or "Coke") afforded no coverage or defense for twenty-one Mississippi lawsuits alleging that, among other things, the insured's male employee had surreptitiously videotaped female customers changing clothes in a women's dressing room on the insured's premises. The district court, on American Guarantee's motion for summary judgment, ruled that the insurer had no duty to defend or indemnify Hattiesburg Coke, Richard Thomson (Coke's chief executive officer), or John Thomson, (Coke's alleged employee-voyeur and Richard Thomson's son) under either Coverage A or Coverage B. (Generally speaking, Coverage A insures against accidental bodily injury and property damage liability; Coverage B insures against non-accidental, non-bodily personal injury liability). Hattiesburg Coke, Richard Thomson, and John Thomson appealed. A prior panel of this court affirmed in part, reversed in part, and remanded in part. See American Guar. & Liab. Ins. Co. v. The 1906 Co., 129 F.3d 802, 810 (5th Cir. 1997)("American Guar. I").[2] That panel affirmed the district court's judgment denying coverage for any claims against John Thomson and claims against Richard Thomson and Hattiesburg Coke based on their alleged vicarious liability for John's acts. That panel also affirmed the district court's ruling that all claims against Richard Thomson and Hattiesburg Coke are excluded from coverage under the Coverage A portion of the policies. See id. However, that panel vacated the district court's ruling that the policies excluded coverage for Richard Thomson and Hattiesburg Coke under Coverage B. See id. at 811. The panel remanded the case for new proceedings on Coverage B. After remand, on American Guarantee's motion for summary judgment, the district court ruled that the insurer also had no duty to defend or indemnify under Coverage B. All adversely affected parties appealed, including Hattiesburg Coke's umbrella insurer, General Star National Insurance Company. We reverse and grant motions for summary judgment against American Guarantee and in favor of Hattiesburg Coke, Richard Thomson, and General Star.[3]

**I. Facts and Procedural History**
A. Background: American Guar. I

---

[2] After this case was filed, Hattiesburg Coke changed its name to "The 1906 Company." To avoid confusion, we follow the first panel's precedent of referring to the company's original name.

[3] John Thomson is not a party to this appeal.

The background facts were well stated in the prior panel opinion. We repeat them verbatim for easy reference:

"Having recently developed an interest in photography while living in Minnesota, John Thomson returned to Hattiesburg, Mississippi with a desire to open his own photography studio. In early 1990, Richard Thomson, John's father and CEO of Hattiesburg Coke, authorized the use of Hattiesburg Coke funds to open a photography studio, Visual Arts Studio (VAS). The new studio was located at 3820 Hardy Street, Hattiesburg, Mississippi, more than a mile from the company's bottling operation. The studio concentrated on photographing and videotaping young women for modeling portfolios and advertisements, as well as 'glamour photography.' Although the studio operated under a different name and was physically separate from the bottling company, it was owned and operated as a division of Hattiesburg Coke. Moreover, the VAS employees were considered employees of Hattiesburg Coke, and all major business decisions concerning the studio, from the purchase of equipment to the scope and ultimate termination of the business, were made at Hattiesburg Coke's corporate headquarters at 4501 Hardy Street.

"By the spring of 1991, VAS was operating in the red and John Thomson wanted to return to school. Thus, Hattiesburg Coke officials decided to terminate the studio's operations. John, however, still had access to VAS and was in the midst of winding up its affairs when the events giving rise to the underlying state court lawsuits came to light.

"In November 1991, a VAS client picked up a videotape which she thought contained her portfolio photographs. When she viewed the tape, she discovered footage of herself dressing and undressing in the VAS dressing room. She reported her discovery to police, who searched the studio and found numerous other tapes containing footage of young women dressing and undressing in the same room. The police also discovered a fiber optic camera concealed underneath a bench in the dressing room.

"In the months following the police investigation, twenty-one women filed lawsuits against John Thomson, Richard Thomson, VAS, and Hattiesburg Coke. These plaintiffs alleged various causes of action including invasion of privacy, outrage, intentional infliction of emotional distress, fraud, negligence, and exploitation of minors. The complaints included allegations that Hattiesburg Coke and Richard Thomson were vicariously liable for John's acts because John acted as a Hattiesburg Coke employee in making the tapes and because John served as a director and officer of Hattiesburg Coke. The complaints also sought to visit liability on Hattiesburg Coke and Richard Thomson for a host of negligence-based torts,

3

including negligent entrustment, negligent supervision, and negligent hiring.

"Hattiesburg Coke held liability insurance policies for the periods in question. American Guarantee, their principal insurer, issued a combined property and comprehensive general liability insurance policy to Hattiesburg Coke covering the period from December 31, 1989, through December 31, 1990. The policy was renewed for the period from December 31, 1990, through December 31, 1991. The policy provided liability insurance coverage of $500,000 per occurrence and $1,000,000 in the aggregate. Hattiesburg Coke was also the named insured under an Umbrella Liability Policy for the Coca-Cola Bottlers Association issued by General Star National Insurance Company ("General Star") for the policy period January 1, 1990, through January 1, 1991. Each General Star policy provided liability coverage of $5,000,000 per occurrence and in the aggregate.

"After discussions concerning coverage, American Guarantee agreed to defend Hattiesburg Coke and Richard Thomson in the state court suits under a reservation of rights, but refused to defend or indemnify John Thomson. In its reservation of rights correspondence, American Guarantee raised several coverage questions, including whether the VAS building was a designated premises; whether the conduct alleged constituted an 'occurrence'; whether the damages alleged constituted 'bodily injury'; and whether John's conduct fell within a policy exclusion for criminal activities. Eventually, nineteen of the twenty-one suits were settled,[4] with John Thomson agreeing to contribute approximately $2,545,000 and General Star agreeing to pay approximately $3,774,000 on behalf of Richard Thomson and Hattiesburg Coke.

"Once the underlying lawsuits were settled, American Guarantee filed this declaratory judgment action against John Thomson, the 1906 Company, Richard Thomson, and General Star to resolve its coverage obligations. The district court found that the insurance policy unambiguously limited liability coverage to injuries arising from certain premises designated on the declarations page of the policy and that the VAS property was not included in that designation. The court also concluded that John Thomson's actions were not within the scope of his employment and that the injuries alleged by the women did not constitute an 'occurrence' under the policy because they were intended or expected from the standpoint of the insured. Accordingly, the district court granted summary judgment in favor of American Guarantee. The court also denied General Star's claim for indemnification for the payments it had made on behalf of Richard Thomson and the 1906 Company.

---

[4] The remaining two suits were dismissed as time barred.

4

See id. at 804-05.

### B. Current Issues Before the Court

In this second appeal by Hattiesburg Coke, Richard Thomson, and General Star, the case returns with little added to the record or the district court's reasons; however, the parties have provided additional oral and written arguments focused on Coverage B. With the benefit of their advocacy, we address the questions that the prior panel pretermitted or did not definitively resolve: (1) whether the state court complaints allege viable causes of action against Hattiesburg Coke and Richard Thompson because of their own negligence in not taking appropriate precautions against the alleged tortious conduct of John Thomson; (2) whether the alleged personal injuries arose out of the conduct of Hattiesburg Coke's business; and (3) if so, whether the complainants' injuries arose out of offenses for which Coverage B provided non-bodily personal injury liability insurance (viz., the offense of the invasion of the right of private occupancy of a room that a person occupies by or on behalf of its owner).

### C. Standard of Review

In our plenary review of the district court's granting and rejecting motions for summary judgment, we decide the foregoing issues of law and insurance policy construction de novo. See Liberty Mut. Fire Ins. Co. v. Canal Ins. Co., 177 F.3d 326, 331 (5th Cir. 1999); Lubbock County Hosp. Dist. v. National Union Fire Ins. Co., 143 F.3d 239, 241-42 (5th Cir. 1998).

## II. Mississippi's Rules for Interpreting Insurance Contracts

The law governing the interpretation of insurance contracts is well settled in Mississippi. In determining whether American Guarantee owes Hattiesburg Coke or its CEO a duty to defend or indemnify, we look to the allegations in the underlying state court complaints. If the complaints state a claim that is within or arguably within the scope of coverage provided by the policy, American Guarantee is obliged to defend and, if necessary, indemnify Hattiesburg Coke. See Centennial Ins. Co. v. Ryder Truck Rental, Inc., 149 F.3d 378, 383 (5th Cir. 1998); State Farm Mut. Auto. Ins. Co. v. Scitzs, 394 So. 2d 1371, 1373 (Miss. 1981) (both noting that Mississippi courts interpret terms of insurance policies, particularly exclusion clauses, favorably to the insured wherever reasonably possible); see also Canal Ins. Co., 177 F.3d at 331 (stating that under Mississippi law, "any doubt as to the existence of a defense obligation is . . . resolved in favor of the insured"). In comparing the complaints with the policy terms, we look not to the particular legal theories

5

pursued by the state complainants, but to the allegedly tortious conduct underlying their suits. See Equal Employment Opportunity Comm'n v. Southern Publ'g Co., 894 F.2d 785, 790-91 (5th Cir. 1990) ("Under Mississippi's 'allegations of the complaint' rule if the factual allegations of the complaint bring the action within coverage of the policy, the insurer has a duty to defend."); see also State Farm Mut. Auto. Ins. Co. v. Taylor, 233 So. 2d. 805, 808 (Miss. 1970) (stating that although an insurer normally bases its duty to defend on the facts alleged in the petition, it may also have a duty to defend if it knows of other facts that warrant coverage). American Guarantee is justified in refusing to defend only if it is clear from the face of the state court complaints that the allegations therein are not covered. See Moeller v. American Guar. & Liab. Ins. Co., 707 So. 2d 1062, 1069 (Miss. 1996); see also Merchants Co. v. American Motorists Ins. Co., 794 F.Supp. 611, 617 (S.D. Miss. 1992) ("[T]he duty to defend is broader than the insurer's duty to indemnify under its policy of insurance: the insurer has a duty to defend when there is any basis for potential liability under the policy"). Moreover, because the state suits allege multiple grounds for recovery, American Guarantee must provide a defense if any ground falls within the terms of the policy. See Southern Publ'g Co., 894 F.2d at 790-91 (adopting the general rule that "[a]n insurer must bear the entire cost of defense when 'there is no reasonable means of prorating the costs of defense between the covered and the not-covered items.'") (quoting Insurance Co. of N. Amer. v. Forty-Eight Insulations, Inc., 633 F.2d 1212, 1224-25 (6th Cir. 1980), cert. denied, 454 U.S. 1109 (1981)). We must give the policy language its plain and ordinary meaning, see Blackledge v. Omega Insurance Co., 740 So. 2d 295, 298 (Miss. 1999) ("terms used in an insurance policy should be understood in their plain, ordinary, and popular sense rather than in a philosophical or scientific sense"), and resolve any ambiguities or equivocal expressions in favor of the insureds, see Ryder Truck Rental, Inc., 149 F.3d at 382-83, but not create ambiguities where none exist. See Scitzs, 394 So. 2d at 1372.

### III. Relevant Coverage B Provisions; Coverage A Distinguished

Coverage B of the CGL policy that American Guarantee issued to Hattiesburg Coke in 1990 provides:

COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY

1. Insuring Agreement.

a. We will pay those sums that the insured becomes legally

6

obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies. . . . We will have the right and duty to defend any "suit" seeking those damages.

\*          \*          \*

b. This insurance applies to "personal injury" only if caused by an offense: (1) Committed in the "coverage territory" during the policy period; and (2) Arising out of the conduct of your business . . . .

\*          \*          \*

SECTION V-DEFINITIONS

\*          \*          \*

10. "Personal injury" means injury, other than "bodily injury", arising out of one or more of the following offenses:
\*          \*          \*
c. Wrongful entry into, or eviction of a person from, a room, dwelling or premises that the person occupies.

In 1991, American Guarantee altered the "wrongful entry" provision of the policy as follows:

c. Wrongful eviction from, wrongful entry into, <u>or invasion of the right of private occupancy of a room</u>, dwelling or premises that a person occupies <u>by or on behalf of its owner, landlord or lessor</u>

(emphasis added).

Coverage B insurance against personal injury liability is typical of such provisions that have been included in CGL policies since the 1980s. <u>See generally</u> M. Jane Goode, <u>Personal Injury Liability Coverage</u>, 30-SPG Brief 39 (Spring 2001); Fritz K. Huszagh & Marisa A. Mancici, <u>Current Issues Involving Insurance of Claims for Personal Injury</u>, 427 PLI/LIT 483 (1992). Coverage B personal injury liability insurance differs from Coverage A bodily injury and property damage insurance in at least two important ways. First, unlike Coverage A, Coverage B may be triggered without proof of an accidental occurrence. Instead, Coverage B is activated by the commission of certain specified offenses during the policy period. Also unlike Coverage A, which excludes coverage for "'[b]odily injury' or 'property damage' expected or intended from the standpoint of the insured," Coverage B expressly extends

7

coverage to liability for "'personal injury' . . . other than 'bodily injury'," caused by certain defined offenses arising out of the insured's business. American Guar. I, 129 F.3d at 808. Therefore, under Coverage B, the triggering act may be intentional.

Consequently, cases turning on the "occurrence" or "accident" requirement of Coverage A type liability insurance (or its exclusion of intentional or expected injuries) are irrelevant to this appeal. See, e.g., Sennett v. United States Fid. & Guar. Co., 757 So. 2d 206, 210-13 (Miss. 2000); Ramsay v. Omnibank, 215 F.3d 502, 503 (5th Cir. 2000); Audubon Ins. Co. v. Stefancik, 98 F. Supp.2d 751, 754-55 (S.D. Miss. 1999); United States Fid. & Guar. Co. v. B & B Oil Well Serv., Inc., 910 F. Supp. 1172, 1176-86 (S.D. Miss. 1995) (all interpreting Coverage A type policies). Also irrelevant to this appeal are cases in which the insured seeks Coverage B personal injury liability coverage for its pollution damage to another person despite the pollution damage exclusion contained in the Coverage A provision of its policy. See, e.g., Gregory v. Tennessee Gas Pipeline Co., 948 F.2d 203, 209 (5th Cir. 1991) (holding that "to extend Coverage B to all property damages, including damages which would be covered under Coverage A, would render the pollution exclusion meaningless"). In other words, in this appeal we are not faced with a claim for overlapping A and B coverage; we deal only with intrinsic Coverage B personal liability insurance claims.

## IV. Discussion of Coverage Issues
### A. The Insureds' Liability Under State Law

Under Coverage B, American Guarantee agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' . . . to which this insurance applies." "Personal injury" is defined by the policy as "injury, other than 'bodily injury', arising out of one or more of the following offenses . . . ." Thus, the threshold question is whether, based on the state court allegations, Hattiesburg Coke and Richard Thomson can be held liable under Mississippi law to pay damages for non-bodily personal injury to the state court plaintiffs. We conclude that they can.

The complainants in the underlying state court actions alleged that, as the result of the negligent acts and omissions of Richard Thomson and Hattiesburg Coke, they sustained personal injuries arising out of John Thomson's wrongful intrusion into the women's dressing room and his clandestine videotaping of their images while they occupied the room to change clothes. In particular, the factual allegations include the following: (1) Hattiesburg Coke and Richard Thomson funded VAS and John Thomson in all aspects

8

of the VAS business, and that Hattiesburg Coke owned the building in which VAS operated; (2) VAS and John Thomson used the Hattiesburg Coke trademark on its letterhead stationary, holding themselves out to be official agents and advertising representatives of Hattiesburg Coke; (3) VAS and John Thomson "set themselves out to the public to be . . . professional photographers"; (4) Hattiesburg Coke and Richard Thomson "induc[ed] the [state court plaintiffs, some of them minors,] to submit to the photograph sessions . . . in the furtherance of the business interests of Hattiesburg Coca-Cola Bottling Company"; (5) Hattiesburg Coke and Richard Thomson "solicited clients for VAS for purposes of its own advertising"; (6) Hattiesburg Coke "purchased the special fiber optic lenses and camera equipment used by . . . John Thomson for the secretive and illicit dressing room photographs . . . [and] that [Hattiesburg Coke] knew, or should have known, that the said special equipment and lenses were not necessary to a legitimate photography business, and were for an improper and illicit purpose"; (7) Hattiesburg Coke "was negligent in purchasing for the [VAS] special 'spy' type lenses and camera equipment that did not have a legitimate purpose in a normal photography studio, and [that Hattiesburg Coke] knew or should have known that the said special lenses and camera equipment were normally used for furtive, secretive photography, which had no legitimate place in a photography studio"; (8) John Thomson "'wired' the changing room with hidden movie cameras and secretly recorded by VCR tape the [state court plaintiff] in the process of changing clothes"; (9) "Thomson then utilized the entire tape of the [state court plaintiffs, whom were minors] to add to his 'composite' tape of other women, all in different stages of nudity"; (10) Thomson shared copies of the tapes with other viewers and possibly sold the copies; (11) John Thomson had a history of distributing "illegitimate" nude photography; (12) Hattiesburg Coke and Richard Thomson "failed to properly warn the [state court plaintiffs] that . . . John Thomson had the propensity to commit illegal acts such as photographing and videotaping [minors] in various stages of undress"; (13) Hattiesburg Coke and Richard Thomson "were negligent in allowing [John Thomson] to utilize the Hattiesburg Coca-Cola Company staff, equipment, and assets in his business efforts to induce the [state court plaintiffs] . . . to be photographed and videotaped in various stages of undress"; (14) Hattiesburg Coke and Richard Thomson "were negligent in failing to keep a proper . . . lookout for safety and well being of the [state court plaintiffs] while in the studios of the defendants" due to the fact that the state court plaintiffs were business invitees of Hattiesburg Coke and

9

Richard Thomson; and (15) the actions of Hattiesburg Coke "in purchasing for [VAS] the special 'spy' type camera lenses and other special camera equipment, when the officers and directors of the said company knew or should have known that such equipment did not have a legitimate purpose in a photography studio, was grossly negligent."

Based on the allegations of the state court complainants, the insureds are potentially liable under three theories of negligence. First, Richard Thomson and Hattiesburg Coke failed to maintain reasonably safe conditions for their business invitees. "Mississippi imposes on business owners 'the duty to maintain the premises in a reasonably secure or safe condition' for business patrons or invitees." Whitehead v. Food Max, Inc., 163 F.3d 265, 271 (5th Cir. 1998) (quoting Lyle v. Mladinich, 584 So. 2d 397, 399 (Miss. 1991); see also id. (further quoting Lyle: "[A]ny business which invites the company of the public must take reasonably necessary acts to guard against the predictable risk of assaults. A business proprietor owes a duty to those entering its premises to provide a reasonably safe place." (internal quotations omitted)). This duty owed by business owners includes the protection of patrons or invitees from the foreseeable wrongful acts of employees and third persons on the premises. See id.; L.T. v. City of Jackson, 145 F. Supp. 2d 756, 759 (S.D. Miss. 2000)

(citing Little by Little v. Bell, 719 So. 2d 757, 760 (Miss. 1998); Steele v. Inn of Vicksburg, Inc., 697 So. 2d 373, 377 (Miss. 1997)). "'[A]n invitee is a person who goes upon the premises of another in answer to the express or implied invitation of the owner or occupant for their mutual advantage.'" Little by Little, 719 So. 2d at 760 (quoting Hoffman v. Planters Gin Co., 358 So. 2d 1008, 1011 (Miss. 1978)); Steele, 697 So. 2d at 377 (quoting Skelton v. Twin County Rural Elec. Ass'n, 611 So. 2d 931, 936 (Miss. 1992)).

Second, the insureds were potentially liable for negligently hiring John Thomson. Under Mississippi law, an employer may be held liable for negligently hiring an employee who intentionally injures another if, prior to the injury, the employer knew or should have known of the employee's propensity for the conduct in question. Thatcher v. Brennan, 657 F. Supp. 6, 10 (S.D. Miss. 1986) (citing Jones v. Toy, 476 So. 2d 30, 31 (Miss. 1985)); Freeman v. Lester Coggins Trucking, Inc., 771 F.2d 860, 861 n.1 (5th Cir. 1985); Schultz v. Evelyn Jewell, Inc., 476 F.2d 630, 631 (5th Cir. 1973)); Tichenor v. Roman Catholic Church, 32 F.3d 953, 960 (5th Cir. 1994); cf. Restatement (Second) of Torts § 307 (1965) ("It is negligence to use an instrumentality, whether a human being or a thing, which the actor knows or should know to be so incompetent, inappropriate, or defective, that its use

10

involves an unreasonable risk of harm to others.").

Third, Hattiesburg Coke and Richard Thomson are potentially liable for their entrustment of the VAS facilities and equipment to John Thomson. Mississippi has adopted the doctrine of negligent entrustment as defined by the Restatement (Second) of Torts § 390 (1965):

> One who supplies directly or through a third person a chattel for use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

See Sligh v. First Nat'l Bank, 735 So. 2d 963, 968 (Miss. 1999) (quoting section 390); Tillman v. Singletary, No. 1999-CA-00686-COA, 2001 WL 268246, *3 (Miss. Ct. App. March 20, 2001) (same).[5]

___

[5] We believe that the Mississippi courts would also follow the closely related Restatement (Second) of Torts § 308 (1965) (providing a more general definition of negligent

Additionally, John Thomson's voyeuristic acts fall squarely within two of Mississippi's intentional torts: (a) invasion of privacy and (b) outrageous conduct causing severe emotional distress. In each instance, the state's courts have expressly or

___

entrustment: "It is negligence to permit a third person to use a thing or to engage in an activity which is under the control of the actor, if the actor knows or should know that such person intends or is likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others."). See also id. § 7 ("'[I]njury' . . . denote[s] the invasion of any legally protected interest[;] 'harm' denote[s] the existence of loss or detriment in fact of any kind to a person[;] 'physical harm' . . . denote[s] the physical impairment of the human body, or of land or tangible chattels."). Under the Restatement (Second) of Torts § 46, liability may result from extreme and outrageous conduct intentionally or recklessly causing severe emotional distress even without bodily contact or harm. See, e.g., Adams v. U.S. Homecrafters, Inc., 744 So. 2d 736, 742-43 (Miss. 1999) Smith v. Malouf, 722 So. 2d 490, 497-98 (Miss. 1998) (both recognizing a right to recover for mental anguish in the absence of bodily injury).

11

implicitly adopted the pertinent sections of the Restatement (Second) of Torts.

Sections 652B and 652C of the Restatement (Second) of Torts, in pertinent parts, state the elements of invasion of privacy: "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B (1977). "One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." Id. § 652C. The Mississippi Supreme Court has held that a person is liable if there has been "interference with plaintiff's seclusion . . . that would be highly offensive to the ordinary reasonable man, as the result of conduct to which the reasonable man would strongly object." Candebat v. Flanagan, 487 So. 2d 207, 209 (Miss. 1986) (quoting id. § 652B cmt. d). Although the Mississippi Supreme Court has not expressly adopted section 652C, we think that it would if it were presented with a case falling within its ambit.[6]

Finally, the Mississippi Supreme Court has recognized the tort of intentional or reckless infliction of emotional distress by extreme and outrageous conduct. The Restatement (Second) of Torts § 46 (1965) provides: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." See Speed v. Scott, 787 So. 2d 626, 629 n.1 (Miss. 2001) (acknowledging the existence under Mississippi law of the cause of action detailed by Restatement (Second) of Torts § 46); Donald v. Amoco Prod. Co., 735 So. 2d 161, 178-79 (Miss. 1999) (same).

Considering the facts alleged by the plaintiffs in the underlying state court lawsuits, taken as true and construed in the light most favorable to the

---

[6] Mississippi has expressly adopted several of the Restatement's invasion of privacy provisions. See, e.g., Plaxico v. Michael, 735 So. 2d 1036, 1039 (Miss. 1999) (quoting § 652B); Young v. Jackson, 572 So. 2d 378, 382 (Miss. 1990)(adopting § 652D); Candebat v. Flanagan, 487 So. 207, 212 (Miss. 1986) (adopting § 652H); Prescott v. Bay St. Louis Newspapers, Inc., 497 So. 2d 77, 79 (Miss. 1986) (adopting § 652E). Furthermore, the Mississippi Supreme Court has made clear that it has not yet defined the outer limits of the state's invasion of privacy law. See Young, 786 So. 2d at 381 ("We have made no effort to identify the outer limits of a person's right of privacy and certainly make none here").

12

plaintiffs, and complying with our Erie duty, we conclude that the Supreme Court of Mississippi would decide that (1) John Thomson committed the torts of invasion of privacy and extreme and outrageous conduct upon the plaintiffs in the underlying state lawsuits; and that (2) Richard Thomson and Hattiesburg Coke may be held liable for their own negligence in the state lawsuits under at least three theories of recovery:(a) failure to take reasonable precautions to protect the victims, as invitees, from the foreseeable intentional torts of John Thomson; (b) negligent hiring of John Thomson to operate VAS although they knew or should have known of John Thomson's propensity to commit the intentional torts against the victims; and (c) negligently entrusting John Thomson with the VAS studio and equipment highly susceptible to voyeuristic uses although they knew or should have known that he was likely because of his history, character, and propensities to use them to personally injure the victims.

### B. Personal Injury "Arising Out of the Conduct of" the Insureds' Business

Under Coverage B, American Guarantee agreed to indemnify Hattiesburg Coke and Richard Thomson for non-bodily personal injury liability caused by an offense "arising out of the conduct of" the insureds' business. American Guarantee argues that this provision precludes coverage because John Thomson's acts at VAS did not arise out of the conduct of Hattiesburg Coke. This court in American Guar. I concluded that, under the facts alleged by the state court complainants, their personal injuries were caused by the offenses of John Thomson which arose out of the conduct of VAS's business, as part of Hattiesburg Coke's business, and was managed and directed by the company and its CEO from the company headquarters on the designated premises. The prior panel said:

> [I]n the present case the phrase "arising out of" the "use" of the designated premises requires that there be a causal connection between the injuries to the women improperly videotaped by John Thomson and the designated premises located at 4501 Harding Street. We further conclude that such a connection exists. It is undisputed that the decisions to set up VAS, construct its offices, purchase equipment, and, eventually, to close it down, were all made by Richard Thomson and other Hattiesburg Coke officials and employees at Hattiesburg Coke headquarters, a designated premises. Moreover, VAS was

13

operated as a formal division of Hattiesburg Coke, with John Thomson assigned the title of vice president of Hattiesburg Coke's "Visual Arts Division." In addition, Richard Thomson testified in his deposition that all of Hattiesburg Coke's divisions shared the same general checking account and that all of VAS's expenses were paid from this account. John Thomson was required to pay all VAS expenses from a rolling petty cash account and then submit his expenses and receipts to Hattiesburg Coke, which would then remit these sums back into the account. Under the circumstances, a factfinder could find a causal connection between Hattiesburg Coke and Richard Thomson's supervisory activities, the operation of the designated premises, and the injuries that resulted from John Thomson's intentional and tortious actions at VAS. . . . Were we confined to finding a causal connection between the injuries stemming from the improper videotaping at VAS and use of Hattiesburg Coke's premises at 4501 Hardy Street as a building, we doubt we would reach the same conclusion. However, a CGL policy is designed to insure its holder from more than just injuries arising from the condition or use of its buildings as buildings. For the reasons described above, we conclude that the requisite causal connection exists between the injuries alleged in the underlying state court lawsuits and the use of the company's

> _headquarters by Richard Thomson and Hattiesburg Coke to supervise John Thomson's activities at VAS, a wholly-owned division of the company_. Thus, the negligence claims against Hattiesburg Coke and Richard Thomson are _not excluded from_ coverage by _the_ designated premises endorsement.

_American Guar. I_, 129 F.3d at 807-08 (emphasis added). The first panel, in reaching the decision that there was the requisite causal connection between the alleged personal injuries and the corporate headquarters premises, expressly stated that it did so because the VAS operations from which the actionable offenses arose were conducted by Hattiesburg Coke as part of its business at its headquarters, and not because of a physical connection between the personal injuries and the company headquarters building. Consequently, the prior panel necessarily decided that the alleged injuries arose out of the conduct of the insured's business. For virtually the same reasons, we conclude that John Thomson's acts arose out of the conduct of Hattiesburg Coke's business.

## C. The Offense of Invasion of the Right of Private Occupancy of a Room by or on Behalf of Its Owner

American Guarantee was obligated to defend and indemnify Hattiesburg Coke and Richard Thomson against all of the state court complainants' actions because (1) Coverage B of the 1991 policy may be reasonably interpreted to insure against offenses, i.e., torts, that accrued in 1991; (2) the alleged torts of invasion of privacy committed by John Thomson all accrued in 1991; and (3) the alleged personal liability of Hattiesburg Coke and Richard Thomson reasonably may be found to have arisen out of offenses of invasions of private occupancy of a room that persons occupied by or on behalf of its owner.

1. "Offense committed during . . . the policy period."

Coverage B of the 1991 insurance policy "applies to . . . '[p]ersonal injury' caused by an offense arising out of your business . . . but only if the offense was committed . . .

15

during the policy period." Coverage under the 1991 policy began on December 31, 1990 and ended on December 31, 1991. The policy does not define "offense" or "committed."

The ordinary meaning of "offense" is "a breach of a moral or social code" or "an infraction of law." Merriam Webster's Collegiate Dictionary 806 (10th ed. 1997). Because the policy insures against liability arising out of certain "offenses," the word in this context conveys the same meaning as "tort." "Tort" has the same meaning in the ordinary and legal senses. Compare id. at 1245 ("a wrongful act other than a breach of contract for which relief may be obtained"), with Black's Law Dictionary 1496 (7th ed. 1999)("A civil wrong for which a remedy may be obtained"), and 1 Dan B. Dobbs, The Law of Torts § 1, at 1 (2001)("a legal wrong . . . that causes harm for which courts will impose civil liability"). Consequently, "a wrong is called a tort only if the harm which has resulted, or is about to result from it, is capable of being compensated in an action at law for damages." W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 1, at 4 (5th ed. 1984). In ordinary parlance, "commit" means "to carry into action deliberately: perpetrate a crime." Merriam Webster's Collegiate Dictionary 231 (10th ed. 1997). Thus, in both legal and ordinary language, to commit an offense that results in liability (i.e., a tort), means to engage in

conduct that amounts to a legal wrong and that causes harm for which courts will impose civil liability. Taken in this sense, an offense, or tort, is not committed unless and until the injury that results from it amounts to a harm for which courts will impose civil liability.

Correlatively, the Mississippi Supreme Court has held that "[a] tort is not complete until an injury occurs." McMillan v. Puckett, 678 So. 2d 652, 654 (Miss. 1996)(en banc). The McMillan court also held that "'[a] cause of action accrues only when it comes into existence as an enforceable claim; that is when the right to sue becomes vested.'" Id. (quoting Owens-Illinois, Inc. v. Edwards, 573 So. 2d 704, 706 (Miss. 1990)).[7]

_____

[7] In interpreting a venue statute authorizing the commencement of a civil action in the county "where the cause of action may occur or accrue" the McMillan court explained the difference between "occur" and "accrue":

> We read accrual in its formalistic sense. A cause of action accrues when it comes into existence as an enforceable claim, that is, when the right to sue becomes vested. This may well mean the moment injury is inflicted, that point in space and time when the last

16

Consequently, we believe the Mississippi Supreme Court, reading the policy from the standpoint of a reasonable purchaser of insurance, would either (1) interpret "offense . . . committed . . . during the policy period" to include an accrued or completed tort, or (2) conclude that the phrase is ambiguous and should be construed in favor of coverage. See Great N. Nekoosa Corp. v. Aetna Cas. & Sur. Co., 921 F. Supp. 401, 419 (N.D. Miss. 1996) (holding that it is unclear whether the "offense" of emotional distress occurs at the time of the causative act or at the time that the plaintiff learned of the act, and therefore interpreting the term to allow for coverage).

Under Mississippi law, the tort of invasion of privacy accrues when the plaintiff discovers or through exercise of reasonable diligence should have discovered the invasion. See McCorkle v. McCorkle, No. 1999-CA-01711-COA, 2001 WL 19727, at *5-*6 (Miss. Ct. App. Jan. 9, 2001); see also Tichenor v. Roman Catholic Church, 32 F.3d 953, 962 (5th Cir. 1994) (acknowledging Mississippi's application of the discovery rule to invasions of privacy involving "inherently undiscoverable" injury). All of the original twenty-one state court claimants first discovered in November 1991 that John Thomson had invaded the young women's rights of privacy. Eighteen of them alleged that Thomson videotaped them in 1991. The remaining state claimants alleged that he taped them in 1990 but that they had not learned of the incidents until 1991. American Guarantee does not contend that any of the claimants failed to exercise reasonable diligence. Thus, the torts of invasion of privacy alleged in all of the state court actions accrued in 1991. Accordingly, if the alleged liability of Hattiesburg Coke and Richard Thomson arose out of the offense of "invasion of the right of private occupancy of a room . . . that a person occupies by or on behalf of its owner," American Guarantee is obliged to defend and indemnify the insureds in all of the state cases under Coverage B of its 1991 policy.

2. "Invasion of the right of private occupancy of a room"

The "invasion of the private right of occupancy" phrase is not defined in the

---

legally significant fact is found. "Occur" is a less formalistic term. It is event oriented to its core. It connotes conduct and phenomena and imports no preference among all of those necessary that a plaintiff may sue.

678 So. 2d at 655 (internal citations and emphases omitted).

policy and has not been interpreted by the Mississippi courts. Therefore, according to Mississippi rules of insurance contract interpretation, we must give it its plain, ordinary, and popular meaning.

The Mississippi Supreme Court often consults leading dictionaries to determine the ordinary meaning of insurance contracts. See, e.g., Bank of Mississippi v. Mississippi Life & Health Ins. Guar. Ass'n, 730 So. 2d 49, 57 (Miss. 1999); Merrimack Mut. Fire Ins. Co. v. McDill, 674 So. 2d 4, 9 (Miss. 1996); Allstate Ins. Co. v. Moulton, 464 So. 2d 507, 509 (Miss. 1985); Blackledge, 740 So. 2d at 301 (McRae, J., dissenting). The mainstream dictionary definition of "invasion" is "an act of . . . encroachment or trespassing." Webster's New World Dictionary 740 (1976); Webster's Deluxe Unabridged Dictionary 965 (1979); American Heritage Dictionary 688 (1979). Similarly, "invade" means "to encroach upon" or "to affect injuriously and progressively." Merriam Webster's Collegiate Dictionary 615 (10th ed. 1997). "Private" commonly means "intended for or restricted to the use of a particular person, group, or class" or "[w]ithdrawn from company or observation." Id. at 927. A thing is "private" if it is "[s]ecluded from the sight, presence, or intrusion of others." American Heritage Collegiate Dictionary 1089 (3d ed. 1993). In its ordinary sense, a "right"

includes "something due to a person . . . by law." Id. at 1175. The common-place meaning of "occupancy" is "[t]he period during which one owns, rents, or uses certain premises." Id. at 944. "Occupy" means "to fill up (time or space)." Id.

It is apparent from the above definitions that an average purchaser of insurance could reasonably understand the phrase "invasion of the right of private occupancy of a room" to include the invasion of a room that is secluded from the sight, presence, or intrusion of others. John Thomson's invasion by hidden camera of the young women's right to occupy and change clothes in the women's dressing room reasonably falls within this definition.

The United States Supreme Court has recognized that a person has a constitutional right to privacy whenever he or she has a reasonable expectation of privacy. See Kyllo v. United States, 121 S.Ct. 2038, 2043 (2001) (reaffirming the rule that a person has a constitutional "expectation of privacy" when "society is prepared to recognize [that expectation] as reasonable"). Mississippi has emphatically recognized the tort of invasion of privacy and in doing so has taken notice of an individual's right to privacy under state law. Mississippi also requires of commercial property owners the highest duty to protect their business invitees from unreasonable risks of harm while visiting their premises. Hence, we conclude that the Mississippi

18

Supreme Court would find that John Thomson, by secretly videotaping the young women in VAS's dressing room, invaded their "right of private occupancy" of that room.

Related Mississippi case law supports our anticipation of this conclusion. See Candebat, 487 So. 2d at 209 (finding a person liable if there has been "interference with plaintiff's seclusion . . . that would be highly offensive to the ordinary reasonable man, as the result of conduct to which the reasonable man would strongly object."); Plaxico, 735 So. 2d at 1038-39 (recognizing that the defendant violated the plaintiff's reasonable expectation of privacy when he took voyeuristic nude photographs of her while she was in her bedroom); see also Malloy v. Sears, Roebuck & Co., No. 4:96CV157-EMB, 1997 WL 170313, at *1 (N.D. Miss. Mar. 4, 1997) (recognizing a business invitee's state law cause of action for "unreasonable intrusion upon the seclusion of another" where the defendant's employee peeped on the invitee while she was using the restroom on the defendant's premises). Considering Mississippi's vigorous protection of the right of privacy, it is reasonable to anticipate that an "invasion of the right of private occupancy of a room" would be interpreted by the state's courts as including John Thomson's surreptitious videotaping of female business invitees disrobing while occupying a private dressing room.

Alternatively, if the Mississippi Supreme Court does not adopt this meaning outright, we believe that it would find that the phrase is ambiguous, recognize that the foregoing interpretation is reasonable, and, in accord with its precedents, apply it in the present case in favor of coverage. Well reasoned opinions of other courts have found the same policy language highly ambiguous and susceptible to providing coverage in a wide array of circumstances.

In New Castle County v. National Union Fire Ins. Co., 243 F.3d 744 (3d Cir. 2001) ("New Castle III") the Third Circuit, after a comprehensive survey of cases nationwide, concluded that the phrase "invasion of the right of private occupancy" is ambiguous as a matter of law. See id. at 756 ("A single phrase, which insurance companies have consistently refused to define, and that has generated literally hundreds of lawsuits, with widely varying results, cannot, under our application of commonsense, be termed unambiguous"). Moreover, as the New Castle III court points out, the courts which claim to have divined one true meaning of the phrase have ended up espousing three different and inconsistent interpretations. See id. at 750-753; see also Goode, supra, at 41-43 & nn. 21-35 (citing and discussing a wide spectrum of case law regarding the meaning of the phrase "right of private

occupancy"). [8] This wide variance in interpretations is itself evidence that the phrase is ambiguous. See id. at 756.

New Castle III also illustrates the breadth of meaning that reasonably may be attributed to the phrase "right of private occupancy." At issue in that case was whether a county's failure to award a building permit in violation of the applicant's due process rights qualified as an invasion of the applicant's private right of occupancy of the property. Id. at 749. Employing rules of insurance contract interpretation similar to Mississippi's, the court found the phrase to be ambiguous and liberally construed it in favor of coverage.

Other courts finding the phrase to be ambiguous have also found coverage under far-reaching circumstances. See Titan Holdings Syndicate, Inc. v. City of Keene, 898 F.2d 265, 272-73 (1st Cir. 1990) (holding that a similar phrase included the interference in the quiet use of property resulting from

"noxious odors, noise and light"); Beltway Mgmt. Co. v. Lexington-Landmark Ins. Co., 746 F.Supp. 1145, 1156 (D.D.C. 1990) (holding that the phrase encompasses liability for a breach of the implied warranty of habitability of an apartment); Town of Goshen v. Grange Mut. Ins. Co., 424 A.2d 822, 825 (N.H. 1980) (finding coverage under the phrase where a town planning board refused to allow a property owner to develop a subdivision in violation of his civil rights).

In light of the comprehensive studies undertaken by New Castle III and other courts, we are convinced that the present case is simple by comparison and falls well within the ambit of a reasonable interpretation of the phrase. Consequently, in view of the Mississippi rules of insurance policy construction, the ordinary meanings of the words involved, and the persuasive reasoning of New Castle III, we conclude that the Mississippi Supreme Court would construe the clause in favor of coverage in the present case.

3. "[B]y or on behalf of its owner, landlord, or lessor"

Of the many ordinary usages of the word "by," several lend cogent meaning to the policy clause: "through or through the medium of"; "through the agency or instrumentality of"; in conformity with"; "according to"; "on behalf of"; or "with respect to." Merriam Webster's Collegiate Dictionary 157 (10th

---

[8] In her article, Jane Goode collects various cases and finds that the term "right of private occupancy" has been interpreted to require a range of activity, from as much as a physical trespass upon a real property interest to lesser intrusions and impairments of the use and enjoyment of property, such as an invasion of privacy or a mere legal encroachment upon an economic interest. See Goode, supra, at 41-43 & nn.21-35.

20

ed. 1997). "On behalf of" is commonly thought to mean "in the interest of" and "as a representative of." Id. at 103. Therefore, the phrase reasonably may be interpreted to mean that, in order for there to be coverage, the victim must be occupying the room "through," "through the medium of," "through the agency or instrumentality of," "by the authority of," "according to," "in relation to," or "in the interest of" the owner of the room. Thus, in the ordinary sense of the words, the young women in the underlying litigation were occupying the dressing room "through," "by the authority of," and "in the interests of" its owner, Hattiesburg Coke, when John Thomson violated their rights of private occupancy of a room.

Consequently, we think the Mississippi courts would apply that reasonable meaning in favor of coverage, either as their own interpretation or in accordance with Mississippi law governing the construction of ambiguous insurance contracts. The Third and Eighth Circuits have held that the effect of the phrase is ambiguous and that it must be construed in favor of coverage. See New Castle County v. National Union Fire Ins. Co., 174 F.3d 338 (3d Cir. 1999) ("New Castle I"); Royal Ins. Co. of America v. Kirksville College of Osteopathic Med., 191 F.3d 959, 963 (8th Cir. 1999) (following the New Castle I holding that the phrase is ambiguous).

Accordingly, we conclude that American Guarantee was obliged to defend and indemnify Richard Thomson and Hattiesburg Coke under Coverage B of the 1991 CGL policy in the underlying state court actions.

## V. Reimbursement of Attorney's Fees

Hattiesburg Coke and Richard Thomson seek reimbursement for attorney's fees and expenses incurred in hiring separate and independent counsel. In Moeller v. American Guarantee and Liability Insurance Company, 707 So. 2d 1062, 1069 (Miss. 1996), the Mississippi Supreme Court stated:

> When defending under a reservation of rights, . . . a special obligation is placed upon the insurance carrier. . . . [N]ot only must the insured be given the opportunity to select his own counsel to defend the claim, the carrier must also pay the legal fees reasonably incurred in the defense.

We are bound by the Mississippi Supreme Court's decision in Moeller. The insureds hired separate counsel because American Guarantee only agreed to defend Hattiesburg Coke and Richard Thomson under a reservation of rights and because the insureds were

potentially exposed to liability in excess of the CGL policy limits. Because we have determined that the claims contained allegations covered under Coverage B, _Moeller_ mandates that Hattiesburg Coke and Richard Thomson be reimbursed for the reasonable costs of obtaining a separate attorney. _See_ _id._ at 1071 ("Because [the insureds were] being defended under the . . . claim with a reservation of rights, American Guarantee was obligated to let them select their own attorney at American Guarantee's cost").

Although American Guarantee acknowledges the _Moeller_ decision, the company argues that we should not retroactively apply its holding. We reject American Guarantee's argument. The Mississippi Supreme Court has clearly held that its rulings apply retroactively except in cases involving government action or public monetary resources. _See_ _Ales v. Ales_, 650 So. 2d 482, 484-85 (Miss. 1995). Because _Moeller_ involves neither of those exceptions, its holding controls this case, which was pending when the Mississippi Supreme Court issued the opinion.

## VI. Conclusion

Accordingly, we conclude that American Guarantee is obligated to defend and indemnify Hattiesburg Coke and Richard Thomson in the underlying state lawsuits. We REVERSE the grant of summary judgment for American Guarantee and REMAND the case to the district court with instructions for it to grant summary judgment in favor of Richard Thomson and Hattiesburg Coke and against American Guarantee, decreeing that American Guarantee is obliged to defend, indemnify, and reimburse them in connection with the underlying state court actions in accordance with this court's opinion. The case is remanded for these purposes and for further proceedings consistent herewith.

22