# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 22, 2023

Lyle W. Cayce
Clerk

————————

No. 22-60247

————————

Gold Coast Commodities, Incorporated,

*Plaintiff—Appellant*,

*versus*

Crum & Forster Specialty Insurance Company,

*Defendant—Appellee*.

———————————————————————

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:18-CV-793

———————————————————————

Before Clement, Oldham, and Wilson, *Circuit Judges*.

Edith Brown Clement, *Circuit Judge*:

A Mississippi city alleges that an animal foodstuff maker intentionally dumped hot, greasy wastewater into its sewer system. Because those allegations control our review, we AFFIRM.

**I**

Gold Coast Commodities, Inc. makes animal feed—using saponified poultry and plant fats—at its facility in Rankin County, Mississippi. Because its production process involves, among other things, old restaurant grease and sulfuric acid, Gold Coast is left with about 6,000 gallons of oily, "highly

acidic," and "extremely hot" wastewater each week. So, what does Gold Coast do with its wastewater? Seven years ago, the City of Brandon, Mississippi told a state agency that it believed Gold Coast was "discharg[ing]" that "oily, low-pH wastewater" into the public sewers.[1] As a result, the Mississippi Department of Environmental Quality launched an investigation.

In response, Gold Coast assured the Department that it "did not know" where the wastewater came from. But, to the City, things weren't adding up. Shortly after the Department visited Gold Coast, "truckloads" of its "foam[y]," "dark brown" wastewater began regularly appearing at a rarely used dump site in Pelahatchie, Mississippi. When asked about it, Gold Coast said the company typically re-uses its wastewater, but plainly admitted that—in violation of its Pelahatchie dumping arrangement—it wasn't recording the waste's pH levels or volume.

Suspecting foul play, the City started digging around, too. It collected sewage samples from discharge sites near Gold Coast's facility. From that, the City concluded that "Gold Coast was [] clearly dumping significant amounts of high-temperature, corrosive, low-pH wastewater" into the public sewers. Specifically, the City found solidified grease in the pipes "immediately downstream" of Gold Coast, and chemical analyses of the waste samples revealed discrepancies between collection points. The upstream samples had temperatures of about 81 degrees with pH levels ranging between 3.89 and 6.79. But, at "the Gold Coast point of discharge and in downstream sewer pipes," the waste was about 120 degrees with pH

---

[1] The facts that follow are from a complaint filed by the City against Gold Coast. As noted later, we take those allegations as they are.

levels between 1.43 and 1.62.[2] Also, the downstream waste had abnormally high concentrations of arsenic, lead, cadmium, chromium, and mercury. Armed with this data, the City sued Gold Coast for "consistently and surreptitiously discharg[ing] [] high-temperature corrosive waste into the City's sewer system for an unknown number of years leading up to 2014."[3] In its complaint, the City—raising claims of negligence—insists that Gold Coast did so "recklessly, wantonly, and intentionally." Because the affected pipes were "severely corroded," the City had to expend "significant funds" repairing its sewer system.

Two months before the Department's investigation, Gold Coast purchased a pollution liability policy from Crum & Forster Specialty Insurance Company. After the City filed suit, Gold Coast—seeking coverage under the provisions of its Policy—notified the insurer of its potential liability. But, Crum & Forster refused to defend Gold Coast. The insurer insisted that, because the Policy only covers accidents, the City's suit—which Crum & Forster determined was based on intentional conduct—wasn't covered. In response, Gold Coast brought this lawsuit asking the district court to "declar[e] that the Policy requires Crum & Forster to defend and otherwise provide coverage" for Gold Coast. On a motion to dismiss, the district court agreed with Crum & Forster—that the City wasn't alleging an accident—and tossed Gold Coast's lawsuit. Gold Coast appeals.

––––––––––––––––––––––

[2] In terms of acidity, that's somewhere between sulfuric acid and vinegar. UNITED STATES GEOLOGICAL SURVEY, pH SCALE, https://www.usgs.gov/media/images/ph-scale (last visited May 19, 2023).

[3] According to the City, Gold Coast did this to other municipalities, too. After the Department's investigation began, Gold Coast started shipping its wastewater to the City of Jackson. But, Gold Coast allegedly disposed of that waste "without proper treatment" and "via an unauthorized connection" in violation of state environmental regulations. Consequently, the Department sent Gold Coast a cease and desist order.

No. 22-60247

## II

We review the grant or denial of a Rule 12(b)(6) motion *de novo*. *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008). And, we look at "questions of law concerning the interpretation of [an] insurance contract[]" *de novo. Liberty Mut. Fire Ins. Co. v. Canal Ins. Co.*, 177 F.3d 326, 331 (5th Cir. 1999).

Here, the Policy is governed by Mississippi law. In Mississippi, whether an insurer has a duty to defend against a third-party lawsuit "depends upon the language of the policy." *U.S. Fid. & Guar. Co. v. Omnibank*, 812 So. 2d 196, 200 (Miss. 2002). We—confining ourselves to the words of the third-party—read a policy's terms alongside the "allegations of the complaint." *Farmland Mut. Ins. Co. v. Scruggs*, 886 So. 2d 714, 719 (Miss. 2004). An insurer "has an absolute duty to defend [against] a [third-party] complaint which contains allegations covered by the language of the policy, but it has absolutely no duty to defend those claims which fall outside the coverage of the policy."[4] *Id.* (citation omitted). When comparing the words of the complaint to those of the policy, "'we look not to the particular legal theories' pursued by [a third party], 'but to the allegedly tortious conduct underlying' the suit." *Ingalls Shipbuilding v. Fed. Ins. Co.*, 410 F.3d 214, 225 (5th Cir. 2005) (citations omitted). That's all "well settled" law. *See 1906 Co.*, 273 F.3d at 610; *State Farm Mut. Auto. Ins. Co. v. Taylor*, 233 So. 2d 805, 808 (Miss. 1970) (recognizing Mississippi's longstanding "traditional test").

Turning to the Policy, it only covers an "occurrence," or "an accident, including continuous or repeated exposure to substantially the

---

[4] If "any ground" raised against the insured "arguably" falls under the terms of the policy, then the insurer must provide a defense. *Am. Guarantee & Liab. Ins. Co. v. 1906 Co.*, 273 F.3d 605, 610–11 (5th Cir. 2001).

same general harmful conditions." Per Mississippi case law, we look to the alleged "actions of the insured, not the resulting damages, to decide whether there was an accident." *Nat'l Builders & Contractors Ins. Co. v. Slocum Const., L.L.C.*, 428 F. App'x 430, 432 (5th Cir. 2011) (citation omitted). An accident is an "unanticipated" action that "takes place without the insured's foresight." *Allstate Ins. Co. v. Moulton*, 464 So. 2d 507, 509 (Miss. 1985) (citation omitted). Put simply, it's "an inadvertent act." *Architex Ass'n, Inc. v. Scottsdale Ins. Co.*, 27 So. 3d 1148, 1161 (Miss. 2010); *Slocum*, 428 F. App'x at 432. On the other hand, a deliberate act (*i.e.*, a non-accident) follows when the insured "intended the *underlying action.*" *ACS Const. Co. of Miss. v. CGU*, 332 F.3d 885, 888 (5th Cir. 2003). So, for intentionality, the focus isn't on the "consequences" or "damages [that] flow[] from [the insured's] act," but instead the alleged tortious act. *Omnibank*, 812 So. 2d at 201.

Reading its complaint, the City alleges—at multiple points—that Gold Coast *intentionally* dumped its wastewater into the public sewers. For example, in the "Facts" section, the City maintains that Gold Coast "consistently and surreptitiously *discharged*" or "*dump[ed]*" its wastewater into the sewer system. And, under "Count I: Negligence," the City says that "Gold Coast breached its duty to the City by recklessly, wantonly, and *intentionally disposing of its corrosive, low-pH wastewater into the City's sewer system on a consistent basis . . . .*" And, in its prayer for relief, the City asks for damages to cover "Gold Coast's reckless, wanton, *willful*, and *knowing* acts . . . ." Facially-speaking, Gold Coast's alleged wrongdoings clearly sound intentional, not accidental.

For its part, Gold Coast points to the City's assertion that it was "negligent," and that "Count I of the City's Complaint specifically sought to recover [under] . . . negligence." In short, Gold Coast maintains that, because the City advances claims of negligence, the alleged wrongdoings are arguably accidental in nature. We aren't convinced.

No. 22-60247

As noted, we look only to the "allegedly tortious conduct underlying" the City's lawsuit, "not to the particular legal theories" raised in it. *Ingalls*, 410 F.3d at 225. In doing so, we ignore any legal "characterization[s]" made by the parties. *See Acadia Ins. Co. v. Hinds Cnty. Sch. Dist.*, 582 F. App'x 384, 392 (5th Cir. 2014). Here, the word negligence only appears a few times in the body of the complaint, and each time it takes the form of a legal theory (*e.g.*, "Gold Coast is liable to the City for negligence"). But, that makes sense: "Negligence is not a factual allegation . . . ." *Acadia*, 582 F. App'x at 395 (Clement, J., concurring in part and dissenting in part) (quotation marks and citation omitted). Instead, it's "a legal conclusion" and, as such, "cannot itself bring a complaint within the scope of an insurance policy's coverage" in Mississippi. *Id.* (citation omitted). Drive-by or "conclusory use[s] of the word 'negligence'" don't "transform the character of the factual allegations of intentional conduct against [the insured] into allegations of accidental conduct constituting an 'occurrence.'" *Id.* Like any other theory of recovery, a negligence claim must be supported by factual allegations. Turning to the City's allegations—and away from its legal theories as Mississippi law requires—it's clear that the complaint charges Gold Coast with intentional conduct. According to the City, Gold Coast deliberately dumped its wastewater into the public sewers for several years. And, per the City, those discharges damaged its sewer system.[5]

Besides, labels aren't binding. For example, in *Omnibank* a third-party complaint alleged that a defendant-insurer acted "negligently and/or intentionally" when it charged an excessive premium against a group of

---

[5] To determine whether there was an occurrence, the "only relevant consideration is whether"—on the face of the complaint—"the chain of events leading to the injuries" stem from a "course consciously devised and controlled by the insured . . . ." *Architex*, 27 So. 3d at 1153–54 (alterations adopted) (citation and emphasis omitted).

plaintiffs. 812 So. 2d at 200. Per the complaint, the defendant "engaged in a course of conduct which constituted a *negligent* disregard" for the plaintiffs' rights. *Id*. Despite that claim, the Mississippi Supreme Court found there wasn't an occurrence. *Id*. at 201–02. Specifically, the court emphasized that "[e]ven if an insured acts in a negligent manner, [the underlying] action must still be accidental and unintended" to "implicate policy coverage." *Id*. at 197. In *Omnibank*, the defendant didn't "intend to overcharge the plaintiffs, but it did intend to charge them *some amount*." *Slocum*, 428 F. App'x at 433 (emphasis added). So, because the insured's underlying conduct was deliberate—regardless of any unintentional or so-called negligent results— there wasn't an occurrence.[6] *See Omnibank*, 812 So. 2d at 202 (holding that an "insurer's duty to defend . . . does not extend to negligent actions that are intentionally caused by the insured."). As for Gold Coast, it purportedly discharged harmful wastewater into the City's sewers on purpose. Even if it didn't intend the consequences, Gold Coast's alleged underlying conduct was done deliberately. The resulting damage to the sewer's infrastructure is simply "the unintended result of [Gold Coast's] intentional actions." *Slocum*, 428 F. App'x at 433.

The district court found that the "overarching" theme of the City's complaint, regardless of the accompanying "legal labels," is that Gold Coast deliberately dumped wastewater into the public sewers. We agree. Because

---

[6] Consider two other examples. In *Slocum*, we found that the mistaken placement of a home on the wrong property wasn't an accident. 428 F. App'x at 432. We emphasized that a "mistake" is not an "accident" because "the insured intended the action underlying the mistake, even if he did not intend the results or if he based his action on erroneous information." *Id*. And, in *Moulton*, the Mississippi Supreme Court found that a charge of malicious prosecution didn't rise to an occurrence because, although the insured "did not intend [for the third-party] to suffer humiliation or embarrassment, she did intend for him to [be] arrested." *Omnibank*, 812 So. 2d at 196 (citing *Moulton*, 464 So. 2d at 509).

No. 22-60247

no occurrence was alleged in the City's complaint, Gold Coast isn't entitled to a defense from Crum & Forster. We AFFIRM.

No. 22-60247

ANDREW S. OLDHAM, *Circuit Judge*, concurring in the judgment:

While I agree with the majority's conclusion, I respectfully disagree with its reasoning. The City of Brandon's complaint does not allege that Gold Coast Commodities, Inc. ("Gold Coast") committed an intentional tort. At best, the complaint is ambiguous, which would require Crum & Forster Specialty Insurance Company ("Crum & Forster") to defend Gold Coast. *See ACS Constr. Co., Inc. of Miss. v. CGU*, 332 F.3d 885, 888 (5th Cir. 2003).

I would affirm for a different reason: Crum & Forster does not have a duty to defend because Gold Coast's tortious conduct allegedly commenced before the policy's effective date. "A liability insurance company has an absolute duty to defend a complaint which contains allegations covered by the language of the policy, but it has absolutely no duty to defend those claims which fall outside the coverage of the policy." *Farmland Mut. Ins. Co. v. Scruggs*, 886 So. 2d 714, 719 (Miss. 2004). Here, the policy's effective date was August 25, 2016, and the policy did not cover pollution events that started before the effective date. The City of Brandon's complaint in the underlying litigation states the relevant pollution events began before the policy's effective date: "Gold Coast consistently and surreptitiously discharged its high-temperature, corrosive waste into the City's sewer system for an unknown number of years leading up to 2014." The complaint also states that "in the first ten (10) months of 2016, Gold Coast . . . continued to illegally discharge its wastewater into the City sewer system." Crum & Forster therefore does not have a duty to defend.

9