United States Court of Appeals
Fifth Circuit

**F I L E D**

May 18, 2005

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 03-60358

INGALLS SHIPBUILDING

Plaintiff-Appellant - Cross-Appellee

versus

FEDERAL INSURANCE CO

Defendant-Appellee

versus

TRANSOCEAN OFFSHORE INC

Cross-Appellant

-------------------------------------------------------------------

NIGEL S BROUSSARD

Plaintiff

versus

TRANSOCEAN OFFSHORE INC; ET AL

Defendants

TRANSOCEAN OFFSHORE INC

Defendant - Cross Defendant -
Counter Claimant - Cross-Appellant

versus

CERTIFIED EMPLOYEE SERVICES INC

Defendant-Appellee

versus

MH PYRAMID INC

                              Defendant - Cross Claimant -
                        Cross Defendant - Cross-Appellee

                       and

CRAFT WELDING & CONTRACTING CO

                              Defendant - Cross Claimant -
                        Counter Defendant - Cross-Appellee

                       versus

INGALLS SHIPBUILDING

                              Appellant - Cross-Appellee

------------------------------------------------------------------

TRANSOCEAN OFFSHORE

                                    Plaintiff - Appellee -
                                          Cross-Appellant

                       versus

TUDOR INSURANCE CO; ET AL

                                          Defendants

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,
PENNSYLVANIA; NATIONAL FIRE & MARINE INSURANCE COMPANY

                                    Defendants - Appellants -
                                          Cross-Appellees


                        _____

                        No. 03-60557
                        _____


INGALLS SHIPBUILDING

                                          Plaintiff

                       versus

FEDERAL INSURANCE COMPANY

                       -2-

                                                        Defendant

------------------------------------------------------------------

TRANSOCEAN OFFSHORE

                                             Plaintiff - Appellee

                          versus

TUDOR INSURANCE COMPANY; ET AL

                                                       Defendants

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,
PENNSYLVANIA; NATIONAL FIRE & MARINE INSURANCE COMPANY

                                          Defendants - Appellants

_____

            Appeals from the United States District Court
               for the Southern District of Mississippi

_____

Before WIENER, PRADO, Circuit Judges, and LITTLE,[*] District
Judge.

WIENER, Circuit Judge:

## FACTS AND PROCEEDINGS

The underlying facts of the case are undisputed. Ingalls Shipbuilding, Inc. ("Ingalls") operates a shipyard in Pascagoula, Mississippi. In June 1998, Transocean Offshore, Inc. ("Transocean") contracted with Ingalls to install various drilling modules aboard its vessel, the DISCOVERER ENTERPRISE ("Shipyard Agreement"). In connection with the shipyard work, Transocean

_____

[*] District Judge for the Western District of Louisiana, sitting by designation.

executed a Purchase Agreement with Pyramid Constructors, Inc. ("Pyramid") to design and manufacture a derrick structure and install its component parts. Transocean also executed a Master Service Agreement with Craft Welding and Contracting Services ("Craft") to provide welding services on the derrick.

In February 1999, Nigel Broussard sustained injuries while working on the DISCOVERER ENTERPRISE after his head was struck by a steel wedge allegedly dislodged from the vessel's drilling dock. Broussard, an employee of Certified Employment Services, Inc. ("CESI"), was working on the vessel at the time of the incident pursuant to a Contract Labor Agreement between CESI and Ingalls. The sole defendant in the original lawsuit filed by Broussard was Transocean. Broussard subsequently amended his complaint to include several contractors involved in the project — Industrial Corrosion Control, Inc. ("ICCI"), Pyramid, and Craft. Transocean brought third party complaints against Ingalls, ICCI, Pyramid, and Craft seeking insurance defense, indemnity, and coverage. The contracts that Transocean had entered into with each of these parties required that Transocean be named as an additional insured on the contractors' comprehensive general liability policies. Ingalls filed a fourth party complaint against CESI alleging that CESI was obligated to indemnify and defend Ingalls for any liability it had to Transocean.

The district court determined that Ingalls had failed to obtain insurance as required by the Shipyard Agreement, and granted

-4-

Transocean's summary judgment motion for breach of contract. Ingalls then filed a separate suit against CESI's insurer, Federal Insurance ("Federal"), alleging breach of contract and bad faith. Transocean's summary judgment motions against ICCI, Pyramid and Craft were denied because these contractors had obtained insurance in accordance with the agreements that Transocean had entered into with them. Transocean then filed a parallel suit against ICCI's insurer, Tudor Insurance Co. ("Tudor"); Craft's insurer, National Fire and Marine Insurance Co. ("National Fire"); and Pyramid's insurer, National Union Fire Insurance Co. ("National Union"), alleging breach of insurance contract and bad faith for failing to defend Transocean in the Broussard litigation. In October 2001, Ingalls's suit against Federal was consolidated with its fourth party complaint against CESI, and Transocean's claims against ICCI, Craft, and Pyramid were consolidated with its claims against Tudor, National Fire, and National Union.

In February 2002, Broussard settled his claims against Transocean, ICCI, Craft, and Pyramid for $829,000. Transocean paid him $320,000, ICCI paid $279,000, Pyramid paid $120,000, and Craft paid $110,000. Transocean continued its litigation against the contractors and their insurers for reimbursement for its share of the amount of the settlement with Broussard and for attorneys' fees. In April 2002, Transocean settled its claim against ICCI and Tudor.

In September 2002, the district court granted Transocean's motion for summary judgment against National Fire, National Union, and Ingalls on their duties to defend, but found no bad faith. National Fire, National Union, and Ingalls, as primary insurers, were each held responsible to Transocean for an equal share of Transocean's settlement amount, with a reduction for the settlement with Tudor and ICCI, plus reasonable attorneys' fees, costs and expenses. The district court directed defense costs to be measured from the date Transocean served its claims against Ingalls, Pyramid, and Craft. Costs were calculated to include expenditures incurred by Transocean in pursuing its present breach of contract claims.

In June 2003, the district court entered a final judgment for the amounts owed by the parties to Transocean. National Fire and National Union appealed this judgment. Transocean filed a limited appeal in the event that the district court's decision is reversed, appealing the denial of its summary judgment motion against Craft and Pyramid for indemnification and coverage. In addition, Transocean asks that, in the event that the holding against one of the insurers is reversed, the damages be reallocated to the remaining insurers.

In March 2003, the district court granted CESI and Federal summary judgment on Ingalls's claims. This decision was appealed by Ingalls, which appeal was then consolidated with the appeals of National Fire and National Union.

**ANALYSIS**

Standard of Review

We review the grant of summary judgment <u>de novo</u>, applying the same standards as the district court.[1]  Summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.[2]

**I.   INGALLS'S APPEAL**

**A.   Background**

CESI provided Ingalls with skilled laborers (one of whom was Broussard) on an as-required basis under the Contract Labor Agreement.  Broussard did not sue Ingalls for his injury; rather, Ingalls was drawn into the fray by Transocean, which filed a third party complaint against Ingalls for contractual indemnity and insurance coverage under the Shipyard Agreement between the two companies.  As noted, Ingalls filed a fourth party complaint against CESI, claiming that CESI was required by the Contract Labor Agreement to indemnify Ingalls for, and procure insurance covering Ingalls for, liability arising out of the Contract Labor Agreement. The district court granted Transocean's summary judgment motion on its claim against Ingalls.  The court held that by failing to procure insurance as required by the Shipyard Agreement, Ingalls

---

[1] <u>Tango Transp. v. Healthcare Fin. Servs. LLC</u>, 322 F.3d 888, 890 (5th Cir. 2003).

[2] Fed. R. Civ. P. 56(c).

breached the contract and thus is deemed to have assumed the position of Transocean's underwriter.  Ingalls did not appeal the decision.

Ingalls filed suit against Federal, CESI's underwriter, for coverage under CESI's insurance policy.  Ingalls's fourth party complaint against CESI was consolidated with the suit against Federal.

CESI and Federal filed motions for summary judgment and Ingalls likewise filed a motion for summary judgment.  The district court granted CESI's and Federal's motions, finding that the indemnity language in the Contract Labor Agreement did not cover damages from Ingalls's breach of contract with Transocean, and that the insurance CESI was required to procure did not cover Ingalls's breach.

**B.  Ingalls v. CESI**

The Contract Labor Agreement between Ingalls and CESI contains the following provision:

XVII. Insurance

A.  INSURANCE

(a) [CESI] hereby assumes entire responsibility and liability for any and all injury to any and all persons . . . and for any and all damage to property . . . caused by or resulting from or arising out of any act or omission on the part of [CESI], its subcontractors, agents and employees under or in connection with this Purchase Order or the prosecution of the work hereunder and shall indemnify and save harmless [Ingalls], its officers, agents, and employees against and from risk of claims,

demands or damages by third persons arising or alleged to have risen out of the performance of this Purchase Order. [CESI's] liability under this paragraph shall be limited to the risks covered and monetary limits of [CESI's] insurance carried pursuant to paragraph (b) of this article.

(b) [CESI] agrees to maintain during the period of this agreement and at its expense policies of insurance as follows:

. . . .

-Comprehensive, Public, Environmental/Pollution Legal Liability, General and Automobile Liability coverage including completed operations/products liability coverage covering bodily injury, death and property damage including broad form contractual liability coverage, with combined single limits of $2,000,000 with endorsement covering [CESI's] indemnity obligations hereunder; with a severability of interest clause and with [Ingalls] added as an additional assured for any liability arising out of the performance of the work hereunder.

1.    CESI's Duty to Indemnify Ingalls

Ingalls argues that the Contract Labor Agreement required CESI to indemnify Ingalls from claims of third parties arising out of the performance of the Contract Labor Agreement, including Transocean's breach of contract claim against Ingalls. Agreements to indemnify are construed to give effect to the intent of the parties.[3] To determine intent, we look first to the contract language; we only look beyond the language if it is unclear or

_____

[3] Heritage Cablevision v. New Albany Elec. Power Sys., 646 So.2d 1305, 1312-13 (Miss. 1994).

-9-

ambiguous.[4]  The first part of the indemnity provision is an assumption of liability for damage to persons or property "caused by or resulting from or arising out of any act or omission on the part of [CESI], its subcontractors, agents and employees under or in connection with this Purchase Order or the prosecution of the work hereunder."

Ingalls contends that this language should be interpreted as requiring CESI to assume responsibility for injury to all persons whose injuries are caused by or result from (1) any act or omission on CESI's part, (2) in connection with the contract, or (3) the prosecution of the work under the contract.  The language of the contract fails to support Ingalls's construction.  The plain language limits CESI's responsibility to injuries or damage caused by CESI, "its subcontractors, agents and employees."  In the present case, the harm was caused to an employee, Broussard.  The claim in question lies outside the ambit of this language.

The second part of the indemnity provision indemnifies Ingalls "against and from risk of claims, demands or damages by third persons arising or alleged to have risen out of the performance of this Purchase Order."  The claim that Ingalls seeks reimbursement for, however, rose out of Ingalls's breach of the Shipyard

_____

[4] Id. at 1313.  Ingalls argues that the court should apply Mississippi law, as opposed to maritime law.  Because the standard is the same under either, it is not necessary to address Ingalls's argument.  See id. (applying Mississippi law); Robin v. Sun Oil Co., 548 F.2d 554, 557 (5th Cir. 1977) (applying maritime law).

-10-

Agreement with Transocean, not from the performance of the Contract Labor Agreement.[5]  Ingalls was held to be in breach of contract under the Shipyard Agreement for failing to obtain insurance that covered Transocean.  Ingalls tries to recharacterize its liability, arguing that the damages claimed by Transocean for breach of contract arose from the fact that Broussard was working at Ingalls, thereby rising out of the performance of the Contract Labor Agreement.

We have rejected analogous claims that indemnity agreements encompass claims made by third parties against the indemnitee for the indemnitee's own contractual indemnity obligations absent clear expression in the contract that such coverage is intended to be included.  In Corbitt v. Diamond M. Drilling Co., we addressed claims similar to these.[6]  The facts of Corbitt that are pertinent to this case are as follows:  Shell Oil contracted with two companies, Diamond M. and Sladco, to work on a drilling operation. When an injured employee of Sladco sued Diamond M. in tort, Diamond M. sought indemnification from Shell pursuant to their contract. Shell then filed a third-party action seeking indemnification from Sladco as the employer of the injured plaintiff, pursuant to their

_____

[5] This scenario can be contrasted with one where Broussard sued Ingalls directly for his injuries.  The claim would then be one in tort for an injury incurred while performing under the Contract Labor Agreement.  In that scenario, the second part of the indemnity provision might apply.

[6] 654 F.2d 329 (5th Cir. 1981).

-11-

contract. Thus, in Corbitt, Shell was situated similarly to Ingalls, and Diamond M. and Sladco, which had no contract between themselves, were situated similarly to Transocean and CESI, respectively. We held that Shell was not entitled to indemnification from its contractor, Sladco, because the indemnification provision in the contract between Shell and Sladco, as Corbitt's employer, restricted the scope of Sladco's indemnification duty to obligations sounding in tort. Although the underlying claim sounded in tort, we concluded that the obligation for which Shell sought indemnification was contractual in nature, as it arose from the agreement between Shell and Diamond M. Applying maritime law, we declined to interpret the phrase "all claims" to include such contractual obligations.[7] We explained that

> [a] contract of indemnity should be construed to cover all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties, but it should not be read to impose liability for those losses or liabilities which are neither expressly within its terms nor of such character that it can reasonably be inferred that the parties intended to include them within the indemnity coverage. Thus, for example, it is widely held that a contract of indemnity will not afford protection to an indemnitee against the consequences of his own negligent act unless the contract clearly expresses such an obligation in unequivocal terms. A contract to indemnify another for his own

---

[7] The indemnification agreement in Corbitt read in relevant part: "[Sladco] shall indemnify and defend Shell Oil Company ... against all claims, suits, liabilities and expenses on account of injury or death of persons (including employees of Shell or [Sladco] . . .) . . . . arising out of or in connection with performance of this [contract] . . . . ." Id. at 331.

-12-

negligence imposes an extraordinary obligation. Thus an indemnitor is entitled to express notice that under his agreement, and through no fault of his own, he may be called upon to pay damages caused solely by the negligence of his indemnitee. For the same reasons express notice is required where a party seeks to shift his contractual liability to indemnify a third party.[8]

We further ruled that, even though a "contract need not contain any special words to evince an intention to create a right of indemnity for independent contractual liabilities", it "must clearly express such a purpose."[9] Cases that Ingalls points to either support a determination that the language in the Contract Labor Agreement is insufficiently expressed, or are inapposite.[10] For example, in Sumrall v. Ensco Offshore Co., the indemnity provision at issue covered "all . . . causes of action of whatsoever nature or character . . . and whether arising out of contract, tort . . . whether or not caused by . . . Santa Fe [party in Ingalls's shoes] . . . ."[11] Unlike the provision in Sumrall, the indemnity provision at issue here does not include expansive

---

[8] Id. at 333 (internal citations omitted).

[9] Id. at 334 (emphasis added). This broad statement refutes any contention that the present case is distinguishable from Corbitt on the grounds that the indemnity language in Corbitt was limited to personal injury claims.

[10] Ingalls string cites a series of cases which appear to be lifted directly out of the Sumrall opinion, without providing any parentheticals or pin cites, to support its position. In each of the cited cases, the indemnity provision in question required the indemnifying party to indemnify third party contractors of the indemnitee, as well as the indemnitee.

[11] 291 F.3d at 318 n. 4 (emphasis added).

-13-

phrases such as "whatsoever nature or character" or any specific reference to "contract." CESI had no duty to indemnify Ingalls for Ingalls's breach of contract.

2.    CESI's Obligation to Obtain Insurance for Ingalls

Subsection (b) of the "Insurance" provision in the Contract Labor Agreement requires CESI to obtain particular types of liability coverage for Ingalls and to have Ingalls named as an additional insured on the specified types of coverage "for any liability arising out of the performance of the work hereunder." One type of liability coverage CESI was obligated to obtain for Ingalls was "broad form contractual liability coverage." Ingalls argues that CESI's obligation to obtain contract liability coverage included coverage of Ingalls's breach of contract with Transocean.

Assuming that Ingalls is correct in asserting that CESI was obligated to obtain broad form contractual liability coverage for Ingalls, this obligation still would not extend so far as to cover Ingalls for its own breach of contract:

> [C]ourts have consistently interpreted the phrase "liability assumed by the insured under any contract" to apply only to indemnification and hold-harmless agreements, whereby the insured agrees to "assume" the tort liability of another. This phrase does not refer to the insured's breaches of its own contracts.[12]

---

[12] 1 Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes § 7.05, at 460 (12th ed. 2004) (citing cases); see also Musgrove v. Southland Corp., 898 F.2d 1041, 1044 (5th Cir. 1990) ("The assumption by contract of the liability of another is distinct conceptually from the breach of one's contract with another.").

-14-

Ingalls's liability to Transocean resulted directly from Ingalls's breach of contract, not from any contractually assumed liability. It therefore falls outside of any contractual obligation CESI had to procure insurance coverage for Ingalls.

### C.    Ingalls v. Federal

Ingalls contends that, irrespective of CESI's obligation to obtain insurance coverage for Ingalls, Federal is obligated to reimburse Ingalls as an Additional Insured under Federal's policy with CESI.  Under the Contract Labor Agreement, CESI was required to have Ingalls named as an additional insured under CESI's policies with Federal.  Ingalls relies on Endorsement 5 and 6 of CESI's Federal policy as support for its position that Federal had an obligation to cover Ingalls's breach of contract.[13]  Ingalls's

---

[13]

**Endorsement No. 5**

Additional Insureds And Waivers Of Subrogation Endorsement
Privilege is hereby granted the Assured to agree to name as Additional Assureds on all policies others for whom the Assured is performing work or who are performing work for or with the Assured, provided the Assured shall have so agreed prior to loss. Such others who the Assured has agreed to name as Additional Assureds shall become Additional Assureds hereunder upon the Assured entering into such agreement, and no further notice, declaration, amendment, or endorsement shall be necessary to constitute any such others as Additional Assured.
. . . .
Notwithstanding the preceding provisions . . . no party shall be deemed an Additional Assured and no waiver or release of subrogation shall extend to any extent  greater than required by the agreement entered into between such party and the Assured.

**Endorsement No. 6**

Action Over/Indemnity Buyback Endorsement

-15-

contention fails for several reasons. First, as the district court pointed out, Federal's coverage obligations are limited by the coverage agreed to in the Contract Labor Agreement. Ingalls's quotation of Endorsement No. 5 in its brief cherry-picks the language, conveniently omitting the dispositive language: "Notwithstanding the preceding provisions . . . no party shall be deemed an Additional Assured and no waiver or release of subrogation shall extend to any extent greater than required by the agreement entered into between such party and the Assured." As CESI's indemnity and insurance obligations do not extend to Ingalls's breach of contract, Federal's coverage does not extend that far either.

Second, Endorsement No. 6 covers only those amounts "paid on account of investigation, defense and indemnity as respect its responsibilities, if any, to third parties by virtue of defense and indemnity obligations <u>assumed under written contract or agreement</u>."[14] Ingalls did not <u>assume by contract</u> any indemnity

---

In consideration of the premium charged hereunder, it is hereby understood and agreed that this policy, subject to all of its terms and conditions, warranties, and limit of liability, is endorsed to indemnify the Assured for amounts for which it shall have become liable to pay and shall have paid on account of investigation, defense and indemnity as respect its responsibilities, if any, to third parties by virtue of defense and indemnity obligations assumed under written contract or agreement . . . .

[14] As Ingalls's claim fails for other reasons, we need not consider whether Endorsement No. 6 covers Ingalls at all, given that it is limited to the "Assured" and does not mention "Additional Assureds."

obligation to Transocean; there was only a promise to provide insurance coverage. The damages owed by Ingalls to Transocean were incurred as a result of its breach, not as a result of any assumed liability. Once again, Ingalls's reliance on the obligation of CESI to obtain "broad form contractual liability coverage" does nothing to support Ingalls's claim. "Contractual liability coverage" extends only to contractual assumption of the liability of another party, not to liability incurred through the breach of one's own contract with another.[15] Federal's summary judgment motion was properly granted.

## II. NATIONAL FIRE'S APPEAL

### A. Background

The Master Service Agreement entered into by Craft and Transocean provided that Craft would maintain comprehensive general liability insurance and cause Transocean to be named as an additional insured. National Fire issued a general liability policy to Craft with an additional insured endorsement naming Transocean as an additional insured pursuant to the terms, conditions and exclusions of the endorsement. As a result of the Broussard litigation, Transocean made a written demand for insurance, defense and indemnity from Craft and its underwriters. This demand was expressed in a letter to Craft's counsel dated April 17, 2001. In September 2001, Transocean filed a claim

---

[15] See note 12 and supporting text.

against National Fire for denying coverage and defense to Transocean. Denying that it owed Transocean defense or indemnity, National Fire filed a motion for summary judgment. In the alternative, National Fire insisted that there was no duty to defend because of the late notice from Transocean. On the same date, Transocean filed a cross motion for summary judgment.

The district court granted Transocean's cross motion, holding that National Fire had a duty to defend and is liable for one-fourth of Transocean's share of the settlement with Broussard, plus reasonable attorneys' fees. Costs were assessed from the date that Transocean served its claim against Craft, and included expenditures incurred in connection with the current breach of contract action.[16] National Fire filed a motion to reconsider which was denied by the district court, and this appeal followed. The parties agree that Mississippi law applies.

**B.    National Fire's Duty to Defend Transocean**

On appeal, National Fire makes three arguments: (1) The terms of the insurance endorsement did not require it to defend Transocean; (2) it had no duty to defend Transocean because Transocean failed to provide timely notice of the claim; and (3) it had no duty to defend or indemnify Transocean because the policy was merely "excess" to other coverage under the endorsement.

---

[16] Unlike National Union, National Fire does not dispute on appeal the district court's award of attorneys' fees incurred in the instant litigation.

-18-

1.    Duty to Defend

National Fire maintains that under the terms of the endorsement, no duty to defend Transocean was triggered by Broussard's lawsuit.  The endorsement reads:

> 1.    WHO IS AN INSURED . . . is amended to include as an insured the person or organization (called "additional insured") shown in the schedule [Transocean] but only with respect to liability arising out of:
>
>> A.    "Your work" for the additional insured(s) at the location designated above, or
>>
>> B.    Acts or omissions of the additional insured(s) in connection with their general supervision of "your work" at the location shown in the Schedule.
>
> 2.    With respect to the insurance afforded these additional insureds, the following additional provisions apply:
>
>> . . . .
>>
>> B.    Additional Exclusions.  This insurance does not apply to:
>>
>>> . . . .
>>>
>>> (3) "Bodily injury" or "property damage" arising out of any act or omission of the additional insured(s) or any of their employees, other than the general supervision of work performed for the additional insured(s) by you.

The parties do not dispute that the policy covers any liability of Transocean that arises out of (1) Craft's work, or (2) Transocean's negligent supervision of Craft.  Mississippi has adopted the "allegations of the complaint" rule (sometimes referred to as the eight-corners test) to determine whether an insurer has

-19-

a duty to defend.[17]  We review the allegations in Broussard's complaint to see whether it states a claim that is within or arguably within the scope of the coverage provided by National Fire's policy.[18]  When comparing the words of the complaint with the words of the policy, "we look not to the particular legal theories" pursued by Broussard, "but to the allegedly tortious conduct underlying" the suit.[19]  Broussard's second amended complaint named Craft, Pyramid, and Transocean as defendants, alleging:

> **VI.**
>
> Plaintiff would not have been injured if the defendants performing work in the derrick, ot [sic] Transocean Offshore Inc. as vessel owner, individually and/or severally, had undertaken the precaution of rigging safety netting and toe boards, and removing loose pieces of metal from the derrick.
>
> **VII.**
>
> As a direct and proximate result of the gross negligence of the Defendants, individually and/or jointly, in failing to rig safety netting, toe boards, headache boards, and/or roping off areas of the vessel exposed to

---

[17] Am. Guarantee & Liab. Ins. Co. v. 1906 Co., 273 F.3d 605, 610 (5th Cir. 2001); Farmland Mut. Ins. Co. v. Scruggs, 886 So.2d 714, 719 (Miss. 2004); United States Fid. & Guar. Co. v. OmniBank, 812 So.2d 196, 200 (Miss. 2002); Delta Pride Catfish, Inc. v. Home Ins. Co., 697 So.2d 400, 403 (Miss. 1997). Mississippi law also provides an exception to the "allegations of the pleadings" rule, which holds that an insurer has a duty to defend when presented with extrinsic facts, of which the insurer has knowledge or could obtain knowledge by means of a reasonable investigation, that trigger coverage under the policy. See Mulberry Square Prods., Inc. v. State Farm Fire & Cas. Co., 101 F.3d 414, 422 (5th Cir. 1996). Transocean did not argue this alternate ground for coverage.

[18] 1906 Co., 273 F.3d at 610 (citing cases).

[19] Id. (citing cases).

-20-

falling objects for the protection of persons working below the derrick of D/S DISCOVERER ENTERPRISE, and in failing to remove loose metal objects from the derrick, and in causing a four pound wedge to fall and strike Plaintiff, Plaintiff has suffered personal injury, mental disability, physical pain and suffering, and mental anguish.

Looking solely at the complaint, we cannot determine whether Broussard was suing Transocean in a capacity related to its relationship with Craft, unrelated to its relationship with Craft, or both.  The district court was convinced that the factual allegations in the complaint "clearly provide grist for a claim of vicarious liability or negligent supervision."  The district court might have been overconfident in its statement, but the conclusion is correct.  As one commentator has stated,

When pleadings are of an indefinite, vague and ambiguous nature, the courts have found that the insurer has a duty to defend the insured, at least until the pleadings are clarified.  Any doubts as to the insurer's duty to defend raised by the complaint will be resolved in the insured's favor.  The best advice with respect to ambiguous complaints is: "When in doubt, defend."[20]

The allegations in the complaint could support claims against Transocean for both negligent supervision of Craft and vicarious

---

[20] 22 Eric M. Holmes, Holmes' Appleman on Insurance 2d § 136.2 at 16 (2003) (citing cases).  See 1906 Co., 273 F.3d at 610 (emphasis added) (insurer is justified in refusing to defend "only if it is clear from the face of the state court complaints that the allegations therein are not covered"); Merchants Co. v. American Motorists Ins. Co., 794 F.Supp. 611 (S.D. Miss. 1992) (construing both the allegations of a complaint and the provisions of an insurance contract liberally in determining whether there was a duty to defend).  This method of interpretation is different from that which requires provisions of insurance contracts to be construed liberally in favor of the insured.

liability for Craft's actions.  Under Mississippi law, therefore, National Fire had a duty to defend Transocean.

### 2.    Notice of the Claim

National Fire insists that, even if the policy provided Transocean with coverage, Transocean failed to notify National Fire in accordance with the policy and is therefore barred from seeking coverage under the policy.  The policy's notice provision required the insured to provide written notice "as soon as practicable" after a suit was brought against it.  Interpreting Mississippi law previously, we have said that the phrase "as soon as practicable" "means 'within a reasonable time under all the circumstances to effectuate the objects and purposes of the notice clause.'"[21] "Notice given so late that it is 'unreasonable' or that prejudices the insurer bars recovery by the insured."[22]

National Fire emphasizes that it did not receive notice from Craft, Transocean, or anyone else until two years after the accident and more than eighteen months after Broussard filed suit. Neither of these events is determinative of when notice should have been given.  The policy specifically requires that notice be given "as soon as practicable" once "a claim is made or 'suit' is brought against any insured."  The time of the accident is irrelevant. Broussard's initial complaint neither named Craft as a defendant

---

[21] State of Mississippi v. Richardson, 817 F.2d 1203, 1206-07 (5th Cir. 1987) (quoting Young v. Travelers Ins. Co., 119 F.2d 877, 880 (5th Cir. 1941)).

[22] Id. at 1207.

-22-

nor provided any indication that Transocean's negligence could be related to Craft's work. Rather, the complaint initially named only Transocean, and the policy, as conceded by National Fire, does not cover the additional insureds' own negligence outside of the additional insureds' negligent supervision of the insured. The time for starting the notice clock is the date on which Craft was added to the complaint: That is when a claim against Transocean for vicarious liability or negligent supervision of the insured first became possible. The second amended complaint was filed on November 30, 2000; the record makes clear that Transocean wrote to Craft on April 17, 2001, requesting that it notify its insurer of the insurer's duty under the policy. At the latest, National Fire had notice within four and a half months following the date that the complaint was amended to add Craft as a defendant.

The next question is whether, under all relevant circumstances, the timing of the notice was unreasonable or somehow prejudiced the insurer. The purpose of notice provisions in insurance policies is to give the insurance company "the chance to settle or litigate claims for which it ultimately might be liable."[23] In Bolivar County Board of Supervisors v. Forum Insurance Co.,[24] we concluded that notice was not furnished as "soon as practicable" when (1) there was a five-month delay in providing notice, (2) the case was defended by counsel not obtained by the

---

[23] Id.

[24] 779 F.2d 1081, 1084 (5th Cir. 1986).

-23-

insurance company, and (3) the case had already been submitted to the court for decision by the time notice was given. The circumstances of the instant case stand in obvious contrast to those in Bolivar. National Fire had notice of the suit no more than four and one-half months following the filing of the second amended complaint, and was not only aware of the suit, but participated actively in the settlement proceedings as counsel for Craft. We are satisfied that the timing of the notice provided by Transocean was neither unreasonable nor prejudicial to National Fire's ability to defend Transocean had it chosen to do so.

We conclude, however, that the district court erred in identifying the time when National Fire became obligated to defend Transocean, and hence the forward-looking time from which National Fire is obligated to reimburse Transocean for defense costs in the Broussard litigation. National Fire became obligated to defend Transocean under the policy some time in April 2001, specifically on the day that National Fire became aware of Transocean's April 17 letter demanding a defense. Transocean is a sophisticated party and, as such, could have been expected to request a defense under the policy if it had desired one. And, it would be absurd to require an insurance company to force itself on such a sophisticated party if its services have not been requested.[25] We

_____

[25] See Douglas R. Richmond, The Additional Problems of Additional Insureds, 33 Tort and Ins. L.J. 945, 968 (1998) (quoting Hartford Accident & Indem. Co. v. Gulf Ins. Co., 776 F.2d 1380, 1383 (7th Cir. 1985)) ("An insurance company 'is not required to intermeddle officiously where its services have not

-24-

therefore remand to the district court for a recalculation of the defense costs that National Fire is obligated to reimburse Transocean, starting from the date on which National Fire became aware of Transocean's April 17 demand letter.

### 3. National Fire's Excess Insurance Argument

National Fire's final argument is that it had no duty to defend or indemnify Transocean because the terms of the policy established that it provided excess coverage only. National Fire failed to advance this argument in its motion for summary judgment, raising it for the first time in its response to Transocean's motion for summary judgment.[26] In that response, National Fire based its excess insurance argument on an "other insurance" provision contained in the insurance policy, but failed to cite to the location of that provision or to quote its language. As a result, the district court relied on the wrong excess insurance provision in making its decision.[27]

---

been requested.'").

[26] Although this court is not obligated to comb through the record to determine whether an argument has been properly preserved — the obligation falling on the proponent — after a thorough review of the record we were unable to locate any response by National Fire to Transocean's motion for summary judgment. It is the responsibility of the parties to make sure that the record on appeal is complete. The court finally obtained a copy of National Fire's response, along with several other missing motions, after contacting the district court and National Fire's counsel.

[27] The district court looked to the "other insurance" provision in the body of the policy. That provision, however, had subsequently been amended by endorsement.

-25-

Following the issuance of the district court's order granting Transocean's motion for summary judgment and denying National Fire's motion, National Fire filed a timely motion for reconsideration. Despite National Fire's failure properly to raise its excess-insurance argument in its original motions, the district court considered the applicable "other insurance" provision of the policy and denied National Fire's motion for reconsideration. National Fire failed to appeal the denial of the motion for reconsideration; hence, its appeal covers only the summary judgment motion.

It is the obligation of the party to direct the court's attention to the facts and law supporting its argument. As a result of National Fire's failure to raise the argument properly before the district court, we have no obligation to address it. Although we have no obligation to do so, a brief review of the provision shows that, even if it were applicable, National Fire would still have a duty to defend Transocean. The "Other Insurance" endorsement to the National Fire policy provides:

> This insurance is excess over any other insurance . . . . When this insurance is excess, we will have no duty under Coverage A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit." If no other insured defends, we will undertake to do so, but the insured's rights against all those other insurers who have a duty to defend the insured are transferred to us.

The record reflects — and it was never disputed until the motion for reconsideration — that no other insured stepped in to defend

Transocean. In its motion for reconsideration, National Fire first argued that Transocean had access to a self-insurance policy. Motions to alter or amend a judgment "cannot be used to raise arguments, which could, and should, have been made before the judgment issued."[28] The sole evidence National Fire provided to support its new contention was a copy of Transocean's response to a document production request made by Ingalls. On appeal, National Fire has added a copy of the proffered self-insurance policy and also a brief excerpt from a deposition by Ingalls of a Transocean officer. Given National Fire's failure to provide anything more than a bare bones assertion, and at such a late stage, the district court did not abuse its discretion in refusing to consider the additional evidence. Further, it appears that National Fire had access to this evidence at the time it filed its motion for summary judgment, yet has offered no reason for its belated inclusion. We have upheld the refusal by district courts to consider such evidence.[29] Under the language of the policy, therefore, National Fire had a duty to defend Transocean.[30]

---

[28] Pluet v. Frasier, 355 F.3d 381, 385 n.2 (5th Cir. 2004).

[29] See Hopper v. Frank, 16 F.3d 92, 98 n.6 (5th Cir. 1994); Waltman v. International Paper Co., 875 F.2d 468, 473-74 (5th Cir. 1989).

[30] On the question of indemnification, it does appear that National Fire's policy was excess and that Ingalls and National Union were primary insurers. Under Mississippi law, however, an insurer who unjustifiably refuses to defend a suit may be liable in damages for the amount of the settlement entered into by the insured. See Mavar Shrimp & Oyster Co. v. United States Fidelity & Guaranty Co., 187 So.2d 871, 875 (Miss. 1966). Therefore,

-27-

We affirm the district court's grant of Transocean's motion for summary judgment on National Fire's breach of its duty to defend Transocean, but remand for a redetermination of defense costs.

## III. NATIONAL UNION'S APPEAL

### A.    Background

Pyramid and Transocean entered into a Purchase Agreement which provided that Pyramid would maintain comprehensive general liability insurance, in which Transocean would be named as an additional insured. At the time the Purchase Agreement was signed, Pyramid was a named insured under a policy with National Union. Transocean contends it is an additional insured pursuant to a blanket additional insured endorsement attached to Pyramid's National Union policy. As a result of the Broussard litigation, Transocean brought a claim against National Union for denying Transocean coverage and for failure to defend it. National Union filed a motion for summary judgment denying that it owed Transocean defense or indemnity. In response, Transocean filed a motion for summary judgment against National Union.

The district court granted Transocean's motion, ruling that National Union had a duty to defend and holding National Union liable for one-fourth of Transocean's share of the settlement with

---

National Fire might still have been obligated to indemnify Transocean for its prorated portion of the settlement despite being only an excess insurance provider.

-28-

Broussard, plus defense costs and reasonable attorneys' fees. Costs were assessed from the date that Transocean served its claim against Pyramid, and included costs incurred in connection with the current breach of contract action. The district court did not find any bad faith on the part of National Union.

On appeal, National Union does not deny that it had a duty to defend Transocean. It argues, however, that under Texas law this duty was never triggered because Transocean failed to make a formal tender of its defense to National Union. Unlike with National Fire, Transocean did not write or otherwise communicate with National Union requesting a defense in the Broussard action. National Union also contends that the district court erred in holding it liable for a portion of Transocean's settlement with Broussard, relying on two distinct arguments for this proposition: first, Transocean's voluntary settlement with Broussard was a breach of National Union's insurance policy, and Texas law bars insureds from recovering such payments; second, there is no evidence in the record to support the district court's conclusion that Broussard's claims against Transocean were within the coverage provided under the additional insured endorsement of the National Union policy. Finally, National Union argues that the district court erred in awarding attorneys' fees incurred by Transocean in the instant litigation and that the district court failed to take account of the fact that National Union's insurance was excess and not primary. We address each of these contentions in turn.

**B. Choice of Law**

The district court declined to conduct a choice-of-law analysis in its consideration of Transocean's claims against National Union, reasoning that the outcome would be the same under either Mississippi or Texas law on both the question of National Union's duty to defend and its duty to indemnify Transocean. On appeal, National Union argues that Texas law should be applied; Transocean asserts that the correct law to apply is Mississippi's. We conclude, however, that a choice-of-law determination must be made before any of National Union's claims are addressed. As noted above, the district court awarded attorneys' fees for the instant litigation to Transocean. "The award of attorneys' fees is governed by the law of the state whose substantive law is applied to the underlying claims."[31] Texas law provides the prevailing party in a breach of contract action with a mandatory award of reasonable attorneys' fees.[32] Mississippi, on the other hand, follows the American Rule regarding attorneys' fees.[33] Mississippi law is well settled that attorneys' fees are not awarded unless expressly authorized by a statute or other provision of law.[34] In

---

[31] Kona Tech. Corp. v. Southern Pac. Transp. Co., 225 F.3d 595, 614 (5th Cir. 2000) (quoting Exxon Corp. v. Burglin, 4 F.3d 1294, 1301 (5th Cir. 1993)).

[32] Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8); Kona Tech. Corp., 225 F.3d at 614.

[33] Huggins v. Wright, 774 So.2d 408, 412 (Miss. 2000).

[34] Sentinel Indus. Contracting Corp. v. Kimmins Indus. Serv. Corp., 743 So.2d 954, 971 (Miss. 1999).

breach of contract cases, attorneys' fees generally are not awarded

as damages absent some provision for them in the contract or a

finding of conduct that justifies the imposition of punitive

damages.[35]  Because (1) the underlying claims in National Union's

appeal are for breach of contract, (2) the award of attorneys' fees

is governed by the law of the underlying claims, and (3) the laws

of Texas and Mississipi are in conflict as to whether attorneys'

fees are awardable in a breach of contract action, we must conduct

a choice-of-law analysis.

When federal jurisdiction is based on diversity of

citizenship, we apply the conflict of law rules of the forum state

— here, Mississippi.[36]  Mississippi has adopted the "center of

---

[35] See id.; Garner v. Hickman, 733 So.2d 191, 198 (Miss. 1999); Greenlee v. Mitchell, 607 So.2d 97, 108 (Miss. 1992); Guar. Serv. Corp. v. Am. Employers' Ins. Co., 898 F.2d 453, 455 (5th Cir. 1990).

[36] Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Mumblow v. Monroe Broadcasting, Inc., No. 03-31013, 401 F.3d 616, 620 (5th Cir. 2005); Herring Gas Co. v. Magee, 22 F.3d 603, 605 (5th Cir. 1994).
In the original complaint filed against the insurers, Transocean alleged the existence of both diversity and admiralty jurisdiction.  We assume that the district court was satisfied it had diversity jurisdiction, as it made no analysis of, and there was no further discussion of, whether admiralty jurisdiction did in fact exist.  Nor did the parties ever discuss the existence of admiralty jurisdiction or ask for the application of maritime law at the district court.  Transocean argues for the first time on appeal that we should apply federal choice of law rules as a court sitting in admiralty.  In its motion for summary judgment, Transocean made no choice of law argument.  In its motion in opposition to National Union's motion for summary judgment, Transocean argued for the application of Mississippi choice of law rules.  Because we are satisfied that we have diversity jurisdiction over the case, we refuse to address for the first time on appeal whether we should apply federal choice of law

gravity" approach to resolving choice-of-law issues in contract cases and has embraced the Restatement (Second) of Conflict of Laws.[37] A court that applies the "center of gravity approach" must determine "which state has the most substantial contacts with the parties and the subject matter of the action."[38] Restatement § 188 identifies a number of factors pertinent to the determination of which State's substantive law must be applied in contract cases: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation, and place of business of the parties.[39]

Transocean urges the application of § 193 of the Restatement, which it maintains requires the application of Mississippi law. Section 193 provides the general rule that the governing law in actions involving insurance contracts, other than life insurance, should be the law of the state that the parties understood was to be the principal location of the risk during the life of the

---

rules. "It is well established that 'parties generally are bound by the theory of law they argue in the district court, absent some manifest injustice.'" Am. Int'l Trading Corp. v. Petroleos Mexicanos, 835 F.2d 536, 540 (5th Cir. 1987) (citations omitted).

[37] See Boardman v. United Serv. Auto. Ass'n, 470 So.2d 1024 (Miss. 1985).

[38] Id. at 1031.

[39] Restatement (Second) of Conflict of Laws § 188(2).

policy.[40]  Although the Mississippi Supreme Court has recognized §
193 as among the choice of law rules applicable in Mississippi,[41]
we conclude that this case presents a situation in which the goals
of the Restatement are better satisfied through application of
Texas law.   The comment to § 193 provides two rationales for
looking to the principal location of the insured risk.  Neither are
evident in the present case.

First, the location often "has an intimate bearing upon the
risk's nature and extent and is a factor upon which the terms and
conditions of the policy will frequently depend."[42]   Here, the
parties to the contract did not contemplate any particular insured
location in negotiating the contract, so that a particular risk
location could not have influenced the terms of the policy.  To the
contrary, the policy is written to cover multiple risks in whatever
states Pyramid does covered work.   Our conclusion on the

---

[40] The Restatement states:
The validity of a contract of fire, surety or casualty insurance
and the rights created thereby are determined by the local law of
the state which the parties understood was to be the principal
location of the insured risk during the term of the policy,
unless with respect to the particular issue, some other state has
a more significant relationship under the principles stated in §
6 to the transaction and the parties, in which event the local
law of the other state will be applied.
Restatement (Second) of Conflict of Laws § 193.  The commentary
to the section states: "The location of the insured risk will be
given greater weight than any other single contact in determining
the state of the applicable law provided that the risk can be
located, at least principally, in a single state." § 193 cmt. b.

[41] See Boardman, 470 So.2d at 1033.

[42] § 193 cmt. c.

inapplicability of § 193 is further supported by comment (b), which states that "[s]ituations . . . where the location of the risk has less significance, include . . . (2) where the policy covers a group of risks that are scattered throughout two or more states."[43]

Second, "the state where the insured will be principally located during the term of the policy has a natural interest in the determination of issues arising under the insurance contract."[44] Even though this is normally true, in the present case Mississippi has almost no interest in the outcome of the dispute. Broussard, a Mississippi resident, has been paid and is no longer a party to the dispute. What remains is a dispute between a corporation with its principal place of business in Texas and a foreign insurer over an insurance contract negotiated in Texas and entered into by a Texas corporation.[45] We faced a similar choice-of-law question in

---

[43] § 193 cmt. b; see also Maryland Cas. Co. v. Cont'l Cas. Co., 332 F.3d 145, 151-56 (2d Cir. 2003) (in deciding which law to apply in determining whether insurer had a duty to defend and indemnify, court concluded the case was an exception to § 193 of Restatement and looked to § 188 because the insured risks under insurance policy were located in numerous states).
Comment (f) on multiple risk policies does not contradict either our conclusion or that stated in comment (b). Comment (f) states that, when a policy insures specific risks located in several states, and the type of insurance coverage has special statutory forms that differ across the several states, such as with fire insurance, the courts should be inclined to treat a case as involving several policies, each governing an individual risk. The comment is inapposite in the present case.

[44] § 193 cmt. c.

[45] Texas's interest in having its law govern the outcome of this case is evident through its own choice of law statutes. Article 21.42 of the Texas Insurance Code provides that "[a]ny contract of insurance payable to any citizen or inhabitant of

-34-

W.R. Grace & Co. v. Continental Cas. Co.,[46] in which we applied
Texas's choice-of-law rules.  Like Mississippi, Texas has adopted
the most-significant-relationship approach of the Restatement
(Second) of Conflict of Laws.[47]  As here, the issues in W.R. Grace
& Co. revolved around the construction and application of insurance
policies.  Grace, a manufacturer of asbestos fireproofing material,
had settled a lawsuit with a number of Texas school districts, and
the question was whether Grace could seek indemnity from its
insurers.  We decided to apply the law of New York instead of that
of the forum state (Texas) because, even though Texas was the
location of the insured risk and the injury, (1) Grace and three of
the insurers maintained their principal places of business in New
York, (2) Grace's insurance broker was located in New York, and (3)
most of the policies were solicited, negotiated and delivered in
New York.[48]  Important to our conclusion that we should apply New
York law was the fact that neither the tort victims nor Texas had
any interest in whether the settlement was paid by Grace or the

---

this State by any insurance company or corporation doing business
within this State shall be held to be a contract made and entered
into under and by virtue of the laws of this State relating to
insurance, and governed thereby."

[46] 896 F.2d 865 (5th Cir. 1990).

[47] Duncan v. Cessna Aircraft Co., 665 S.W.2d 414, 420–21
(Tex. 1984).

[48] W.R. Grace & Co., 896 F.2d at 873.

insurers —— Texas's only interest was in its resident tort victims' compensation and that had been satisfied through the settlement.[49]

We conclude that the choice-of-law question in the present case should be resolved through the application of § 188's factors. The original insurance contract between National Union and Pyramid was negotiated and entered into in Texas,[50] as was the Purchase Agreement, which automatically made Transocean an additional insured under the terms of the policy. National Union is a Pennsylvania corporation with its principal place of business in Pennsylvania; Pyramid, the primary insured under the insurance contract, is a Texas corporation with its principal place of business in Texas; and Transocean, the additional insured, is a Delaware corporation with its principal place of business in Texas. The insurance policy covers Pyramid's work in several states, including Mississippi, as well as entities that become additional insureds under the policy's Blanket Additional Insured Endorsement.[51] Although choice of law is not an exact science, consideration of § 188's factors lead us to conclude that Texas law is the proper law to apply. Mississippi's interest is minimal at

---

[49] Id. at 874.

[50] The original primary insured was named Maritime Hydraulics, U.S., Inc., and the contract was later amended to state that the primary insured was Pyramid.

[51] The Blanket Additional Insured Endorsement provides: "It is agreed that Additional Insureds are covered under this policy as required by **written contract,** but only with respect to liabilities arising out of the operations performed by or for the Named Insured." (emphasis and bolding in original).

best. Its resident, Broussard, has been paid and is not involved in the instant litigation. Even though questions of liability affect the resolution of the issue whether National Union must indemnify Transocean, they are secondary to the questions of insurance policy interpretation in which Texas has a greater interest.

### C. National Union's Duty to Defend Transocean

National Union claims that under Texas law an insurer's duty to defend an insured is triggered only by actual service of process on the insured followed by the transmission of that service to the insurer. The Texas Supreme Court, however, has expressly left open the question whether the duty to defend is triggered when the insurer has actual knowledge of a suit against the insured.[52] In analogous cases, both this circuit and courts of Texas have held that substantial, as opposed to formal, compliance with an insurance policy's notice requirement is sufficient under Texas law,[53] and that the insurer may waive the notice requirement through its action or inaction.[54] It is beyond dispute that National Union was aware of the suit against Transocean. National Union had participated in the Broussard litigation on behalf of its primary

---

[52] Harwell v. State Farm Mut. Auto. Ins. Co., 896 S.W.2d 170, 174 (Tex. 1995).

[53] See Bituminous Cas. Corp. v. Vacuum Tanks, Inc., 75 F.3d 1048, 1056 & n.7 (5th Cir. 1996) (citing Fifth Circuit and Texas cases).

[54] See id. at 1056 & nn.8-9.

insured, Pyramid, from the time Pyramid was added as a defendant. This participation continued all the way through to the settlement with Broussard in February 2002. In the course of its participation, National Union could not have failed to notice that Transocean was a party to the same lawsuit. As for substantial compliance, the breach of contract suit Transocean filed against National Union and the other insurers for failure to provide a defense in the Broussard litigation made clear that Transocean expected a defense from National Union under the policy. National Union waived any requirement of further compliance with the notice provisions of the policy "by failing to request that the suit papers themselves be forwarded or otherwise objecting to the adequacy of the notice provided by" Transocean.[55]

The district court, however, erred in identifying the time when National Union became obligated to defend Transocean, and hence the point from which National Union is obligated to reimburse Transocean for defense costs in the Broussard litigation. National Union became obligated to defend Transocean under the policy on September 10, 2001, the date when Transocean filed its complaint against National Union. It was on that date that National Union was first made aware of Transocean's desire for a defense under the

_____

[55] Id. at 1056. National Union does not argue on appeal that it was prejudiced by late notice, relying solely on its failure-to-tender argument. We note that National Union participated in the settlement talks with Broussard from their inception through its primary insured, Pyramid, and was aware of Transocean's desire for a defense a full five months before the actual settlement.

insurance policy.  The record does not reveal, and Transocean does not argue, that it made any request to National Union for a defense prior to the filing of the complaint.  An insurer has no obligation to force itself onto an insured that has given no indication of its desire for a defense and that has obtained other defense counsel.[56]

We affirm the district court's grant of summary judgment to Transocean on the question whether National Union breached its duty to defend.  We remand, however, for that court to determine the portion of the Broussard defense costs that Transocean incurred after September 10, 2001, the only period for which National Union is responsible.

**D.   National Union's Duty to Indemnify Transocean**

The district court held National Union liable for one-fourth of Transocean's contribution to the settlement with Broussard as damages for breaching its duty to defend.  Under Texas law, however, an insurer that has violated its duty to defend is not barred from contesting its duty to indemnify.[57]  The factual allegations in the pleadings, along with the policy language, determine an insurer's duty to defend, and its duty to indemnify is

---

[56] See note 25 and accompanying text.

[57] See Quorum Health Res., L.L.C. v. Maverick County Hosp. Dist., 308 F.3d 451, 468-69 (5th Cir. 2002) (even if an insurer wrongfully refuses to defend, it is still able to assert the policy defense of noncoverage); Western Alliance Ins. Co. v. Northern Ins. Co. of New York, 176 F.3d 825, 830 (5th Cir. 1999) (an insurer that breaches its duty to defend may not contest the liability of the insured in the underlying settlement or verdict, but remains free to argue that the assumed liability was not in actuality covered under its policy).

triggered by the actual facts establishing liability in the underlying suit.[58] Turning to the relevant policy language, the Blanket Additional Insured Endorsement covers Transocean for "liabilities arising out of the operations performed by or for the Named Insured." Texas courts have broadly construed the phrase "arising out of" in interpreting additional-insured provisions of insurance policies.[59] On the record before us, however, we are unable to determine whether Transocean's alleged liability to Broussard was covered under the additional-insured endorsement.[60] We therefore remand to the district court for a determination of this issue in the first instance.[61]

### E.   Attorneys' Fees

---

[58] Quorum Health Res., 308 F.3d at 468; Trinity Universal Ins. Co. v. Cowan, 945 S.W.2d 819, 821 (Tex. 1997).

[59] Mid-Continent Cas. Co. v. Swift Energy Co., 206 F.3d 487 (5th Cir. 2000) (interpreting Texas case law); McCarthy Bros. Co. v. Continental Lloyds Ins. Co., 7 S.W.3d 725 (Tex. App. — Austin 1999, no pet. h.); Admiral Ins. Co. v. Trident NGL, Inc., 988 S.W.2d 451 (Tex. App. — Houston 1999, pet. denied).

[60] Mid-Continent Cas. Co., McCarthy Bros. Co., and Admiral Ins. Co. are not directly on point in the present case because in each of those cases the injured party was an employee of the named insured. The injured party in the instant case, Broussard, was not an employee of the named insured.

[61] National Union's second argument, that Transocean's settlement with Broussard violated the voluntary payments clause of the insurance policy and therefore National Union is not liable for the settlement amount, fails. "[A]n insurer who first wrongfully refuses to defend an insured is precluded from insisting on the insured's compliance with other policy conditions." Quorum Health Res., 308 F.3d at 468 (internal quotations omitted).

The district court awarded Transocean attorneys' fees incurred in the instant litigation.  National Union argues on appeal that this was improper.  As we stated in our choice-of-law analysis, Texas law provides a mandatory award of reasonable attorneys' fees to the prevailing party in a breach of contract action.[62]  To obtain an award of attorneys' fees under the applicable Texas statute, a party must (1) prevail on a cause of action for which attorneys' fees are recoverable, and (2) recover damages.[63]  Transocean prevailed and was awarded damages on its breach of duty to defend claim.  As we are remanding to the district court the question whether National Union breached its duty to indemnify Transocean, however, we also remand for that court to redetermine the quantum of attorneys' fees owed by National Union to Transocean following the court's reconsideration of the indemnification question.

**F.   Excess Insurance Claim**

National Union contends that the district court failed to take into account the "other insurance" clause in its policy with Pyramid.  The "other insurance" provision states, in relevant part,

> **a.   Primary Insurance**
> This insurance is primary except when b. below applies.  If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary.  Then we will share with all that other insurance by the method described in c. below.

---

[62] Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8); <u>Kona Tech. Corp.</u>, 225 F.3d at 614.

[63] <u>Kona Tech. Corp.</u>, 225 F.3d at 614

...
**c.** **Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

Endorsement #0018 of the policy provides:

**BLANKET PRIMARY COVERAGE ENDORSEMENT**

It is understood and agreed that this policy will apply as primary coverage where required by written contract for work performed by the Named Insured.

The terms of the Purchase Agreement between Transocean and Pyramid required Pyramid to obtain primary coverage. In addition, the certificate obtained by Pyramid reflecting the coverage provided to Transocean also expressly states that the insurance is primary. Thus there is no doubt that National Union's coverage was primary.

National Union nevertheless contends that the district court erred in not requiring contribution by other insurers. When we examine the part of the district court's final order that addresses the recapitulation of damages, we discern no reversible error. First, National Union complains that the district court should have apportioned some of the liability to Tudor. At the time of judgment, Tudor and its insured, ICCI, had settled with Transocean and were no longer involved in the litigation. In its recapitulation of damages, the district court thoroughly examined the effect of the settlement on the amounts owed by Ingalls, National Fire, and National Union, and adjusted the amounts accordingly. On the question of attorneys' fees, the district

-42-

court disregarded any monies spent solely on efforts directed at Tudor or ICCI. As for the liability for Transocean's settlement amount, the district court divided the $320,000 sum by four, leaving Ingalls, National Fire, and National Union each responsible for $80,000. In its brief, National Union fails to direct us to any specific error in the district court's calculation method; and it is not our obligation to confect an argument for them.

Second, National Union attempts to piggy-back on National Fire's argument that the district court failed to take into account Transocean's self-insurance plan.[64] As we concluded above, this argument was no more than a bare-bones assertion before the district court, devoid of citation to legal authority in support of its position. We are satisfied that the district court did not err in rejecting the argument.

## CONCLUSION

To recap, we affirm the district court's grant of CESI's and Federal Insurance's motions for summary judgment. We also affirm the district court's grant of Transocean's motion for summary judgment against National Fire on the question whether National Fire breached its duty to defend. We remand, however, for the district court to determine the amount of Transocean's defense costs for which National Fire is responsible in the Broussard

---

[64] National Union first raised the argument via reference to National Fire's Response to Transocean's Recapitulation of damages in a short supplement brief.

-43-

litigation from the date of National Fire's receipt of Transocean's letter demanding a defense.

As for the district court's grant of Transocean's motion for summary judgment on its claims against National Union, we affirm in part and reverse and remand in part. On remand, the district court shall (1) calculate Transocean's defense costs for which National Union is liable in the Broussard litigation from the date on which suit was filed by Transocean against National Union; (2) decide whether National Union has a duty under Texas law to indemnify Transocean for one-fourth of the amount of Transocean's settlement payment to Broussard; and (3) recalculate the amount of Transocean's attorneys' fees for which National Union is responsible.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.